[No. F043779. Fifth Dist. Aug. 10, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
RICKY LAWRENCE JORDAN, Defendant and Appellant.

### COUNSEL

Larry L. Dixon, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, J. Robert Jibson and Judy Kaida, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**DAWSON, J.**—Ricky Lawrence Jordan appeals from a judgment entered following his conviction by jury of possession of a firearm by a violent felon. (Pen. Code, § 12021.1, subd. (a).) Appellant contends that the superior court erred by denying his Penal Code section 1538.5 motion to suppress a handgun and statements obtained as the result of a *Terry*[1] stop and frisk initiated after the police received an anonymous 911 telephone tip. Appellant argues that (1) his parole search condition, which was not known to the officers at the time of the stop, did not validate the stop, and (2) the anonymous tip did not have sufficient indicia of reliability to create a reasonable, articulable suspicion justifying the stop.

We hold that the factual differences between this case and *Florida v. J.L.* (2000) 529 U.S. 266 [146 L.Ed.2d 254, 120 S.Ct. 1375] are insufficient to merit a different result. In that case, the United States Supreme Court unanimously held that an anonymous telephone tip about an individual with a concealed handgun did not create a reasonable suspicion justifying a stop and frisk. We, of course, are bound by that holding. Also, in light of *People v. Sanders* (2003) 31 Cal.4th 318 [2 Cal.Rptr.3d 630, 73 P.3d 496], the parole search condition imposed on appellant did not validate the stop, frisk and

---

[1] *Terry v. Ohio* (1968) 392 U.S. 1, 24 [20 L.Ed.2d 889, 88 S.Ct. 1868].

seizure of the handgun. Therefore, the motion to suppress should have been granted. We will reverse the judgment of conviction and remand.

## FACTS

On May 1, 2003, the Bakersfield police received an anonymous telephone tip about a man in a park who was carrying a concealed handgun. The telephone call was recorded; a written transcript of the 911 telephone call provides:

"Dispatcher: Bakersfield. 911.

"Male: Uh, operator?

"Dispatcher: Just a second. Hold on. You want an ambulance?

"Male: No, I need the police.

"Dispatcher: Okay. You need two ambulances?

"Male: No, I need the police.

"Dispatcher: No. Just a second. This an emergency?

"Male: Yes.

"Dispatcher: What's your emergency?

"Male: Uh, there's this guy up (unintelligible) on Baker and Sumner.

"Dispatcher: Yeah.

"Male: With a gun. He's wearing a black jacket, tan pants, white shirt, bald head.

"Dispatcher: Is he black, white or a M—Hispanic?

"Male: Black. Light skinned. He's been threatening to shoot people.

"Dispatcher: What kind of gun?

"Male: Uh, small, like a .22, .25.

"Dispatcher: How old is the guy?

"Male: About late 30's, wearing red boots.

"Dispatcher: Black jacket, tan pants, red boots.

"Male: Yeah, white, white shirt.

"Dispatcher: Where does he keep it?

"Male: Uh, in his left—no his right pocket.

"Dispatcher: Front pants pocket?

"Male: Uh jacket.

"Dispatcher: He's got in his right jacket pocket?

"Male: Yes.

"Dispatcher: You gonna leave your name?

"Male: No.

"Dispatcher: And you said Sumner and Baker?

"Male: Yes.

"Dispatcher: Okay. Thank you.

"Male: Okay.

"Dispatcher: Bye."

Nothing in the record indicates how much time elapsed between the end of this telephone conversation and a subsequent radio dispatch to officers. The radio transmissions also were recorded; a written transcript of those transmissions provides in pertinent part:

"Dispatcher[2]: [T]o respond to a subject carrying a concealed weapon, possible at Baker and Sumner. I.D.

"Officer: Three Able Eight One.

---

[2] Based upon the sound of the voices on the audio tape, the woman who took the 911 call was not the woman who sent the radio dispatch.

"Dispatcher: Three Able Eight One, ten four. Unit to assist.

"Officer: Three Able Seven One from Jefferson Park.

"Dispatcher: Three Able Seven One, ten four. Both units. Subject is a black male in his 30's, black jacket, white shirt, tan pants and red boots. Possibly carrying a concealed hand gun in his right front coat pocket. R/P no contact.

"Officer: Three Able Eight One copy."

One of the officers who responded to the dispatch was Michael Gerrity, who was on duty, was in uniform, did not have a partner, and was driving a black and white patrol car. Officer Gerrity arrived at International Square Park in less than one minute after receiving the dispatch and parked the patrol car along Baker Street; the time was approximately 7:15 p.m. He left the patrol car and began to walk through the park. Gerrity saw an individual matching the broadcast description sitting on a park bench that was approximately 50 feet from where he had parked. Concerned with safety, Gerrity took a position behind a tree from which he was able to observe appellant, the individual who matched the description Gerrity had received from dispatch.

Six to 10 other people were in the park, but none of them matched the description given in the radio dispatch. The person closest to appellant was on a bike about 10 feet away. Officer Gerrity watched appellant from behind the tree for approximately 30 to 45 seconds. Appellant was not talking to anyone or engaged in any activity; he was sitting on the bench with his hands in his lap. Gerrity did not see any bulges in appellant's clothes and testified that appellant did not appear to be involved in criminal activity.

Officer Gerrity made eye contact with appellant and then motioned appellant over with his hand and said, "I'm a police officer. I need to speak to you. Please come back to me." Appellant rose from the park bench and again made eye contact with Gerrity, who told appellant to place his hands in the air, turn around and walk backwards to him. Appellant complied with the instructions.

Officer Gerrity noted that, when appellant stood, "his clothing was rather cumbersome, especially the jacket, and I couldn't see what was in front of him in his waistband or inside his pockets."

When appellant had backed up to him, Officer Gerrity took control of appellant by using his left hand to hold appellant's hands behind appellant's head, and using his right hand to feel on the outside of appellant's waistband

and pockets. Prior to touching appellant, Gerrity told him that he was going to search him for weapons and asked if he was holding any weapons. Appellant did not reply.

Officer Gerrity felt a bag of sunflower seeds through the outside of appellant's jacket and, below the seeds, felt what he recognized as the backstrap of a gun. Gerrity asked appellant if he had a firearm in his pocket and, again, appellant did not reply. The officer then handcuffed appellant and retrieved the gun from the pocket. It was a small caliber, chrome-plated or stainless steel semiautomatic pistol. While Gerrity was frisking appellant, two other officers approached on foot and were present when the pistol was found. Gerrity handed the gun to one of those officers. Before leaving the park, Gerrity checked the pistol. The slide and magazine release were functional and the pistol was loaded with one round in its chamber and eight more rounds in its magazine.

Appellant was arrested and taken to the Bakersfield Police Department, where Officer Gerrity read him his *Miranda*[3] rights. Appellant indicated that he understood his rights and that he would answer questions. Officer Gerrity asked appellant how he obtained the gun and appellant said he got the gun from a man known to him only as John.

## PROCEEDINGS

In early June 2003, appellant filed a motion to suppress evidence pursuant to Penal Code section 1538.5, asserting that the stop and frisk which led to his arrest was illegal under the Fourth Amendment standards set forth in *Terry v. Ohio*, and that the evidence obtained was the poisonous fruit of that illegal action. The prosecution opposed the motion on the grounds that (1) appellant was a parolee at the time of the search and did not have a reasonable expectation of privacy, and (2) the patdown search was reasonable.

On June 30, 2003, a hearing was held on the motion to suppress. For purposes of the motion, the parties stipulated that (1) appellant was on active parole at the time of his arrest and was subject to the standard search clause, (2) there were no active warrants or any other reason relating to his parole status to bring him into custody, and (3) there was no search warrant issued at the time of the stop and frisk.

Officer Gerrity was the only witness to testify at the hearing. He testified that (1) he did not know who phoned in the tip, (2) he did not know how the

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

tipster obtained the information, (3) the tip did not predict what the man with the gun was going to do, (4) during his observation and contact with appellant, appellant did not reach for or grab at the pocket where the gun was found or make any other threatening or unusual movements, (5) the gun was not visible to him before he felt it, and (6) he did not know that appellant was on parole when he found the gun.

On July 1, 2003, Judge Fielder denied the motion to suppress without comment. The case was tried to a jury on July 14, 2003, and the jury found appellant guilty of illegal possession of a firearm in violation of Penal Code section 12021.1, subdivision (a). Appellant then waived his right to trial on the alleged enhancements and admitted two 1981 robbery convictions, a 1984 rape conviction, a 1989 robbery conviction, a 1991 conviction for possession of a controlled substance, and a 1996 conviction for illegal possession of a firearm.

On August 21, 2003, Judge Wallace denied appellant's motion to strike prior convictions, denied probation and sentenced appellant to a term of 25 years to life plus two years for two prior prison terms.

## DISCUSSION

### I. *Parole Search Condition Did Not Validate Search*

The prosecution requested that the superior court deny the motion to suppress and hold the *Terry* stop and frisk was reasonable based on the propositions that (1) appellant was a parolee subject to a search condition and (2) parolees who are subject to a search condition do not retain a reasonable privacy expectation to be free of police searches. This argument relied upon the cases of *People v. Reyes* (1998) 19 Cal.4th 743, 750–754 [80 Cal.Rptr.2d 734, 968 P.2d 445] (search valid where officers knew suspect was on parole and subject to search condition despite lack of particularized reasonable suspicion for search) and *In re Tyrell J.* (1994) 8 Cal.4th 68, 89–90 [32 Cal.Rptr.2d 33, 876 P.2d 519] (stop and frisk of juvenile without probable cause upheld because of probation search condition, even though officers were not aware juvenile was on probation).

After the denial of appellant's motion to suppress, our Supreme Court decided *People v. Sanders, supra,* 31 Cal.4th 318 (*Sanders*), and held that a warrantless and "otherwise unlawful search of the residence of an adult parolee may not be justified by the circumstance that the suspect was subject to a search condition of which the law enforcement officers were unaware when the search was conducted." (*Id.* at p. 335.)

The Attorney General addresses the effect of the *Sanders* decision in the appellate brief filed December 23, 2003, as follows: "Appellant's parole search condition is irrelevant to the determination of lawfulness of the detention and pat search. (See *People v. Sanders*[, *supra*,] 31 Cal.4th 318 [2 Cal.Rptr.3d 630, 73 P.3d 496] [the constitutionality of the search involving a parolee must be judged by the facts known to the searching officer; officer's subsequent discovery of a search condition cannot be used to justify an otherwise illegal search].)" Thus, the Attorney General has not attempted to distinguish the *Terry* stop and frisk for a weapon conducted in a public park in this case from a residential search.[4] In light of this position and the recent published decisions by this court and the First Appellate District, we conclude that the holding in *Sanders* applies in this case and proceed to the question whether the gun and appellant's statement are admissible on other grounds.

## II. *Creating Reasonable Suspicion Based on the Reliability of an Anonymous Tip*

During the hearing on the motion to suppress, the prosecution also argued that, regardless of the parole search condition, the stop and frisk was reasonable for purposes of the Fourth Amendment given the accuracy of the physical description in the tip, the potential danger of the situation, and the use of a less intrusive patdown before proceeding to a search of appellant's person.

A *Terry* stop and frisk is justified if the information known to the officers before conducting the stop and frisk is sufficient to create a reasonable suspicion of criminal conduct. (*Terry v. Ohio, supra,* 392 U.S. at p. 30; *United States v. Sokolow* (1989) 490 U.S. 1, 7 [104 L.Ed.2d 1, 109 S.Ct. 1581].) Our discussion of reasonable suspicion begins with a review of *Florida v. J.L., supra,* 529 U.S. 266, and its predecessor, *Alabama v. White* (1990) 496 U.S. 325 [110 L.Ed.2d 301, 110 S.Ct. 2412].

---

[4] This court recently rejected the argument that the holding in *Sanders* should be limited to residential searches, and we held that the stop of a vehicle could not be validated by the fact that three of the occupants of the vehicle were on probation where the officers did not know anyone was on probation at the time of the stop. (*People v. Hester* (2004) 119 Cal.App.4th 376 [14 Cal.Rptr.3d 377].) Similarly, the First Appellate District (1) determined that the rationale of *Sanders* regarding the search of the residence of a parolee applies with equal force to a personal search of a probationer on a public street (*People v. Bowers* (2004) 117 Cal.App.4th 1261, 1270 [13 Cal.Rptr.3d 15]), (2) ruled that "appellant's probation search condition did not justify the search, because the police officer who conducted the warrantless search was unaware of the condition at the time" (*id.* at p. 1264) and (3) remanded for further proceedings to determine whether other circumstances justified the search (*id.* at p. 1273).

A. *Overview of United States Supreme Court Decisions*

1. *Alabama v. White*

In 1990, the United States Supreme Court considered whether an anonymous telephone tip that a person possessed drugs was sufficient to create a reasonable suspicion justifying a *Terry* stop of a suspect in a vehicle. (*Alabama v. White, supra*, 496 U.S. at p. 328 (*White*).) In *White*, the telephone informant told the police the name of a woman who would leave a particular apartment at a stated time carrying a brown attache case with about an ounce of cocaine inside. The informant described the car the woman would drive and named the motel that would be her destination. The police officers waited outside the apartment and observed a woman, who was not carrying anything, enter and then leave in a vehicle fitting the description given by the informant. They followed her as she took the most direct route to, and then stopped her just short of, the motel. The officers obtained the woman's consent, searched the vehicle, and found a locked brown attache case which, when opened, was found to contain marijuana. (*Id.* at p. 327.)

■ Holding first that the "totality of the circumstances" approach is the correct method of analysis in determining whether a reasonable suspicion justifying a *Terry* stop exists, and that this approach requires the consideration of both the quantity and quality of all the information possessed by the police (*White, supra*, 496 U.S. at pp. 328–330), the court stated that the anonymous tip, standing alone, did not justify the *Terry* stop. (*White*, at p. 329.) The court then considered the corroborating information available to the police and, particularly, the caller's ability to predict future behavior of the suspect as a basis for inferring that the informant also was correct in predicting the suspect was involved in criminal activity. (*Id.* at p. 332.) The court determined that it was "reasonable for police to believe that a person with access to [an individual's personal itinerary] is likely to also have access to reliable information about that individual's illegal activities."[5] (*White*, at p. 332.) Accordingly, the majority held: "Although it is a close case, we conclude that under the totality of the circumstances the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of respondent's car." (*Ibid.*)

2. *Florida v. J.L.*

Nearly 10 years after *White*, the United States Supreme Court addressed another anonymous telephone tip and unanimously held that the tip and other

---

[5] This inference was troubling to the three dissenting justices because none of the corroborating information related to criminal activity. (*White, supra*, 496 U.S. at p. 333 (dis. opn. of Stevens, J.).)

information available to the police did not justify a *Terry* stop and frisk. (*Florida v. J.L., supra*, 529 U.S. 266.) The relevant facts in that case were stated by the court as follows: "On October 13, 1995, an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. . . . So far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant. Sometime after the police received the tip—the record does not say how long—two officers were instructed to respond. They arrived at the bus stop about six minutes later and saw three black males 'just hanging out [there].' . . . One of the three, respondent J.L., was wearing a plaid shirt. . . . Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements. . . . One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket. The second officer frisked the other two individuals, against whom no allegations had been made, and found nothing." (*Florida v. J.L., supra*, 529 U.S. at p. 268.)

The court distinguished these facts from those present in *White* because police observations in *White* showed that the informant had accurately predicted the suspect's movements, which made it reasonable for the police to believe that the informant had inside knowledge about the suspect and that the assertion of criminal activity was credible. (*Florida v. J.L., supra*, 529 U.S. at p. 270.) In *Florida v. J.L.*, the informant provided neither (1) any predictive information that allowed the officers to test the informant's reliability nor (2) any explanation for how he knew about the gun or had inside information about the suspect. (*Id.* at p. 271.) Also, the record failed to establish that the informant ran the risk of being held accountable for providing false information to the police. (*Ibid.*; see *Adams v. Williams* (1972) 407 U.S. 143, 146–147 [32 L.Ed.2d 612, 92 S.Ct. 1921] [informant might have been immediately arrested for making false tip in person about a nearby suspect].)

The court specifically rejected the argument that the prompt verification of the description of a particular person at a particular location rendered the tip sufficiently reliable. The court stated that the reasonable suspicion standard "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. [Citation.]" (*Florida v. J.L., supra*, 529 U.S. at p. 272.)

The court also declined to modify the reasonable suspicion standard established in *Terry* by creating a "firearm exception" under which "a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing." (*Florida v. J.L., supra*, 529

U.S. at p. 272.) In rejecting a firearm exception, the court noted: "Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry*'s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. [Citation.] But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms" (*ibid.*), "because 'the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others,' thus allowing the exception to swallow the rule." (*Id.*, at p. 273, quoting *Richards v. Wisconsin* (1997) 520 U.S. 385, 393–394 [137 L.Ed.2d 615, 117 S.Ct. 1416].)

### B. *Courts of Appeal Decisions Discussing Florida v. J.L.*

The California Supreme Court has not yet addressed *Florida v. J.L.*, *supra*, 529 U.S. 266, but the Courts of Appeal have applied the principles set forth in that case in three published decisions, two of which involved anonymous telephone tips.[6]

#### 1. *People v. Saldana*

In *People v. Saldana* (2002) 101 Cal.App.4th 170 [123 Cal.Rptr.2d 763], an anonymous informant calling from a pay phone provided a description of a station wagon in the parking lot of a restaurant at a specified intersection and said the driver of that car was carrying a gun and a kilo of cocaine. A deputy sheriff responded to a transmission of the information in the tip and located the car outside the restaurant. The deputy entered the license plate number into the mobile digital terminal in his patrol car and received information that included the registered owner's name and address. The deputy entered that address in the terminal and discovered that a person from that address was wanted on a four-year-old misdemeanor warrant. When the defendant left the restaurant and got into his car, the deputy followed him and, after requesting backup assistance, stopped the vehicle, ordered the

---

[6] The third case involved two face-to-face reports of information to the police. (*People v. Coulombe* (2000) 86 Cal.App.4th 52, 54–55 [102 Cal.Rptr.2d 798] [tips were sufficiently reliable, grant of motion to suppress reversed].) Generally, information provided to the police in person is regarded as more reliable than an anonymous telephone call because, among other factors, the anonymity of the informant is compromised by the ability of police to subsequently identify someone they have met face-to-face. (See *U.S. v. Christmas* (4th Cir. 2000) 222 F.3d 141, 144; see also *U.S. v. Holmes* (D.C. Cir. 2004) 360 F.3d 1339, 1344 [360 U.S.App. D.C. 298].)

defendant out of the car at gunpoint and handcuffed him. The defendant consented to a search of the car; the police found a bag of marijuana, but did not find a gun or cocaine. (*Id.* at pp. 172–173.)

The Second Appellate District, Division Four, considered whether the anonymous telephone tip was sufficiently corroborated to generate a reasonable suspicion. First, the court concluded that "[t]he tip contained no internal indicia of the basis for or reliability of the informant's information." (*People v. Saldana, supra,* 101 Cal.App.4th at p. 175.) Second, the tip did not contain any predictive information that could be corroborated by observation. Third, the confirmation of the description of the vehicle and its location did not corroborate the criminal element of the tip. Fourth, the deputy's observation of the defendant leaving the restaurant, getting into the station wagon and driving away did not create a suspicion that the defendant was engaged in criminal conduct. Fifth, the outstanding warrant did not support an inference that the driver of the car had a gun and cocaine because the four-year-old misdemeanor warrant was not for the registered owner of the car. (*Ibid.*) Lastly, the warrant did not provide an independent basis for the stop because the warrant described an individual six feet three inches tall in his late 20's and the defendant was approximately five feet six inches tall and in his mid-50's. (*Saldana, supra,* at p. 176.) Accordingly, the court concluded that the anonymous tip was not sufficiently corroborated by observation or other information available to the deputies to justify stopping the car and placing the defendant in handcuffs. Consequently, the Second Appellate District ruled that the motion to suppress had been denied erroneously. (*Ibid.*)

### 2. People v. Butler

In *People v. Butler* (2003) 111 Cal.App.4th 150 [4 Cal.Rptr.3d 1], the Second Appellate District, Division Five, considered whether an anonymous telephone tip and the officer's observations of the suspect after arriving at the scene justified a *Terry* stop and frisk. The anonymous tip indicated that drugs were being sold at a specific location from a specific vehicle. (*Butler,* at p. 153.) This information was corroborated by the officer's observations when he arrived at the location·and saw a hand-to-hand transaction between the driver of the described vehicle and a woman standing next to it. (*Ibid.*) The officer believed, based on his training and experience, that the transaction involved drugs. (*Id.* at p. 156.) The court concluded that the detention was justified because it was commenced shortly after the telephone tip was received, the officer found a vehicle that matched the caller's description at the location described by the caller, and the officer believed he observed a drug transaction, which was the criminal conduct alleged in the call. (*Id.* at pp. 161–162.) Thus, the court upheld the trial court's denial of the motion to suppress.

## C. *Reliability of the Anonymous Telephone Tip in This Case*

### 1. *Quick confirmation of physical description and location*

■ In *Florida v. J.L.*, the police officers reached the bus stop approximately six minutes after being instructed to respond to the anonymous tip that described J.L.'s appearance, clothing and location. The record did not show how much time had elapsed between the anonymous telephone call and the instructions to the officers to respond. The court held that an accurate description of the readily observable appearance and location of a particular person is insufficient to establish the tip is reliable in its assertion of illegality. (*Florida v. J.L.*, *supra*, 529 U.S. at p. 272; see also *People v. Saldana*, *supra*, 101 Cal.App.4th at p. 175; *People v. Folk* (2001) 284 A.D.2d 476 [727 N.Y.S.2d 131]; *People v. Ballard* (2001) 279 A.D.2d 529, 530 [719 N.Y.S.2d 267].)

Similarly, in this case, the officers responded to the radio transmission quickly[7] and found an individual at the stated location matching the detailed description given in the tip. The information about the appearance and location of appellant, without more, however, does not adequately establish that the tip was reliable in its assertion of illegality. (*Florida v. J.L.*, *supra*, 529 U.S. at p. 272.)

### 2. *Police observations of suspicious activity*

■ Where police officers follow up an anonymous tip and observe suspicious behavior, the totality of the circumstances may generate a reasonable suspicion that justifies a *Terry* stop and frisk. (See, e.g., *People v. Butler*, *supra*, 111 Cal.App.4th at pp. 161–162 [indicia of reliability included officer's observations of possible drug transactions, the criminal conduct asserted in the tip]; *People v. Abdul-Malik* (2002) 298 A.D.2d 595, 596 [750 N.Y.S.2d 92, 93] [radio report to officers of 911 anonymous tip about group of four males with guns did not create reasonable suspicion by itself, but officers' stop and frisk of defendant was justified when they saw defendant, who had hands in his pockets, step away from others, circle the group, and make a movement on right side as if adjusting something in waistband]; *People v. Munford* (2004) 2 Misc.3d 1005(A) [784 N.Y.S.2d 923] [responding to a report of a person matching defendant's description firing a gun, officers saw defendant clutching his coat while "trotting" away from them as they approached].)

---

[7] As in *Florida v. J.L.*, the record in this case does not indicate how much time elapsed between the end of the telephone call and the radio transmission of the information to the officers.

In this case, the officer observed appellant for a short interval before directing him to raise his hands and back up towards the officer. During that time, the officer did not see appellant engage in behavior that suggested criminal activity was afoot. Instead, the officer watched appellant sitting on a park bench with his hands in his lap. When appellant saw the officer, he made no threatening or unusual movements. The officer did not see the gun prior to frisking appellant. Thus, the information learned by the officer before he asserted control over appellant did not suggest that appellant was engaged in criminal activity. Instead, the officer's suspicion that appellant was carrying a handgun was based only on the anonymous telephone tip.

### 3. *Police observations of predicted conduct*

When an anonymous tip contains predictive information, the police can test part of the informant's knowledge and credibility by observing whether the predictions are accurate. (*Florida v. J.L.*, *supra*, 529 U.S. at p. 271.) The ability to predict an individual's future actions indicates the informant has some familiarity with that individual's affairs. (*Ibid.*) Here, however, as in *Florida v. J.L.*, the tip included no predictive information from which, if confirmed, the officers could have inferred that the informant also had knowledge of concealed criminal activity. (Cf. *White*, *supra*, 496 U.S. at p. 332 [in a close case, detailed predictions of legal conduct supported inference that informant also knew about concealed criminal conduct].) While the tip did include a prediction, in a sense, that the suspect continued to conceal a gun in his right jacket pocket, that information could not be confirmed prior to the stop and frisk.

### 4. *Source and timing of informant's information*

Among the indicia of reliability absent in *Florida v. J.L.* were explanations from the informant about (1) how he knew about the gun or (2) the basis for his inside information about the suspect. (*Florida v. J.L.*, *supra*, 529 U.S. at p. 271.)

In this case, the 911 operator did not ask and the informant did not tell how he knew that appellant was carrying a small-caliber handgun in his right jacket pocket. The informant did not say whether he personally saw the gun, inferred its presence from other facts he observed, inferred its presence from appellant's reputation, or received the information from another individual. (See *Jackson v. Commonwealth* (2004) 267 Va. 666, 681 [594 S.E.2d 595, 603] [information about the source of informant's knowledge aids in assessing its reliability].) The information that the gun was in appellant's right

jacket pocket was communicated to the police officers,[8] but that detail alone is not sufficient to infer that the informant knew about the gun from his personal observations. Furthermore, the informant did not say when he acquired the information. (See *State v. Williams* (2001) 241 Wis.2d 631 [623 N.W.2d 106, 2001 WI 21] [contemporaneous report of drug trafficking occurring outside informant's apartment]; *U.S. v. Thompson* (D.C. Cir. 2000) 344 U.S. App. D.C. 144 [234 F.3d 725, 727, 729] [motorist told police he "just saw" a man with a gun; recency and proximity of the claimed observation made it more trustworthy].)

Thus, the reliability of the tip in this case is not supported by details about how and when the informant learned the information.

### 5. *Informant fabrication*

In his concurring opinion in *Florida v. J.L.*, Justice Kennedy addressed the potential that a "truly anonymous" tip could be fabricated by the informant: "If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable." (*Florida v. J.L.*, *supra*, 529 U.S. at p. 275 (conc. opn. of Kennedy, J.).)

Justice Kennedy then suggested two types of information that might increase the credibility of an unnamed telephone informant and, correspondingly, decrease the concern of informant fabrication.

### a. *Past performance of informant with recognizable voice*

█ If the voice of the informant is recognized by the authorities as someone who has accurately predicted criminal activity in previous tips, then the prior experience might reduce the uncertainty about the reliability of the tip. (*Florida v. J.L.*, *supra*, 529 U.S. at p. 275 (conc. opn. of Kennedy, J.).) The record in this case does not show that the voice of the informant was the

---

[8] In this case, we restrict our analysis to the information actually provided to the officers in the field because respondent has not addressed whether the information learned by the 911 operator but not relayed to the officers should be imputed to the officers. (See *U.S. v. Colon* (2d Cir. 2001) 250 F.3d 130 [application of the collective or imputed knowledge doctrine and determination that record did not support a holding that information told to a 911 operator could be imputed to police officers].) Information obtained by the 911 operator that was not relayed to the officers included (1) more specific information about the suspect's appearance (bald, light-skinned, and in his *late* 30's), (2) the allegations that the suspect had "been threatening to shoot people," (3) more specific information about the type of gun, i.e., "small, like a .22, .25," and (4) the manner in which the informant reported the information, such as the tone of voice, rate of speech, and accent.

same as a voice that in the past gave information that proved reliable. Thus, the caller in this case did not appear to have a track record that would support the conclusion his tip was reliable.

### b. *Accountability of informant*

■ While a "truly anonymous" informant cannot be identified, located and held accountable for a false tip, a court may consider facts that erode the anonymity of the informant and show the informant risked being held accountable for a false tip. (*Florida v. J.L.*, *supra*, 529 U.S. at p. 275 (conc. opn. of Kennedy, J.); see *Adams v. Williams*, *supra*, 407 U.S. at pp. 146–147 [informant was known to officer, made tip in person, and could have been arrested immediately if tip about nearby suspect was false].) As anonymity decreases and the informant's risk of accountability increases, the inference that the tip is reliable strengthens. (See *Florida v. J.L.*, *supra*, at p. 275 (conc. opn. of Kennedy, J.).)

In the following cases, decided subsequent to the filing of *Florida v. J.L.*, *supra*, 529 U.S. 266, courts in other jurisdictions have addressed factors relevant to the accountability of an informant who calls 911. (*U.S. v. Terry-Crespo* (9th Cir. 2004) 356 F.3d 1170 [man placed emergency 911 call, gave first and last name, spelled last name, and reported that three minutes earlier he had been threatened by man with a .45 handgun in high crime area in Portland; court held tip had sufficient indicia of reliability to create reasonable suspicion and justify *Terry* stop]; *State v. Gomez* (2000) 198 Ariz. 61, 64 [6 P.3d 765, 768] [informant put identity at risk by placing 911 call from traceable private home phone]; *U.S. v. Hernandez* (W.D.N.Y., Apr. 13, 2001, No. 00-CR-6E) 2001 WL 1344832 [officer testified that he had arrested several people for falsely reporting crimes and that the 911 caller who reported the gun would have been investigated if a gun had not been found; investigation was possible because 911 system detected the telephone number from which call was made and police identified the person and address associated with that registered number].)

■ We agree that it is logically appropriate to analyze the accountability of a particular informant in terms of (1) the ability of authorities to identify the informant, (2) the consequences the informant is likely to experience as a result of providing false information, and (3) the informant's perception of these factors.

The record in this case does not demonstrate the ability of the authorities to identify the informant. First, the informant refused to give his name when asked. Second, although the 911 call was taped, the record does not reflect (1) whether the call was subject to tracing by any means, (2) whether information

about the origin of the call, if available at the time, was retained so that a false report could be investigated, or (3) whether the voice recording itself could lead to the identification of the informant. Thus, the record contains no evidence showing there was a realistic probability that the authorities could have identified the caller.

Neither does the record contain anything to indicate that the informant was aware of, or indeed that he faced, any potential consequences from making a false report. Thus, the record sheds no light on informant accountability.

### 6. *Summary*

The record contains only one factor which distinguishes this case from the case in *Florida v. J.L.* That is the fact that the anonymous tip here was recorded and transcribed. This, at least, detracts from any possibility that the tip was the result of police fabrication. (Cf. *U.S. v. Terry-Crespo, supra*, 356 F.3d at p. 1175 [audio tape of 911 phone call from informant reduced concern of after-the-fact police fabrication of an anonymous informant]; *U.S. v. Wheat* (8th Cir. 2001) 278 F.3d 722, 735 [risk that officers would fabricate a 911 telephone tip of erratic driving to harass innocent motorists is "negligible"].) Otherwise, there is no principled way to distinguish this case and, on that basis, we conclude that the opinion in *Florida v. J.L.* dictates the result.

### III. *Public Safety Exception*

Respondent argues, however, that concerns over public safety raised by the presence of six to 10 other people in the park[9] should reduce the indicia of reliability required of the tip to the extent that the officer's confirmation of (1) the detailed description of appellant and (2) his location was sufficient to justify a *Terry* stop and frisk. This argument could be interpreted as advocating the adoption of a rule of law that (1) an allegation the suspect has a concealed handgun and (2) the presence of other people close to the suspect is a substitute for requiring indicia of reliability supporting the tip's assertion of illegality.

The possibility of a public safety exception to the reliability analysis applied to anonymous tips was raised by the lead opinion in *Florida v. J.L.*: "The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for

---

[9] Because a firearm exception to the reliability requirement was explicitly rejected by the United States Supreme Court, a public safety exception cannot be based solely on the allegation of a concealed handgun, but must include additional facts relating to public safety. (*Florida v. J.L., supra*, 529 U.S. at pp. 272–273.)

example, that a report of a person carrying a bomb need bear the indicia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk." (*Florida v. J.L.*, *supra*, 529 U.S. at pp. 273–274.)

In light of the foregoing quote and the United States Supreme Court's analysis of the dangers associated with firearms (*Florida v. J.L.*, *supra*, 529 U.S. at pp. 272–273), we conclude that application of a public safety exception is not possible here.

The facts in this case are not sufficiently distinguishable from those in *Florida v. J.L.* to allow us to take a different course. When the officer observed appellant before initiating contact with him, appellant's behavior and appearance did not suggest that he presented an imminent danger to a specific individual, to the public in general, or to the officer. Appellant was not engaged in unusual or aggressive conduct. Nothing in appellant's behavior indicated that he posed any more danger to the other people in the park than the defendant in *Florida v. J.L.* posed to the two other males "hanging out" at the bus stop.[10] (*Florida v. J.L.*, *supra*, 529 U.S. at p. 268.) Thus, the level of danger in this case is comparable to the level of danger shown by the facts described in *Florida v. J.L.* and, as a result, cannot serve as a substitute for indicia of reliability relating to the assertion of illegal activity.

Respondent's argument also could be interpreted as contending that the danger presented by the situation is simply one more factor included in the totality of the circumstances relevant to determining the existence of a reasonable suspicion. This approach is consistent with the way danger was analyzed by the First Appellate District in *People v. Coulombe*, *supra*, 86 Cal.App.4th 52. In that case, the court considered the danger posed by the alleged possession of a gun in a crowded restaurant as part of its factual analysis of whether a reasonable suspicion existed and, accordingly, the *Terry* stop and frisk was justified. (*People v. Coulombe*, *supra*, at p. 58.)[11] In this

---

[10] Aside from these two males, the facts described by the United States Supreme Court in its opinion in *Florida v. J.L.*, *supra*, 529 U.S. 266, as well as the facts set forth in the written decisions of the Florida appellate courts (see *J.L. v. State* (Fla. 1998) 727 So.2d 204, 205, quashing *State v. J.L.* (Fla.Dist.Ct.App. 1997) 689 So.2d 1116, 1117), did not provide any information about the presence or the absence of other individuals within range of a gunshot fired from the location where the defendant was stopped. Thus, the First Appellate District's statement in *People v. Coulombe*, that the possession of the concealed handgun in *Florida v. J.L.* occurred "with only two of the suspect's friends present" (*People v. Coulombe*, *supra*, 86 Cal.App.4th at p. 58), cannot be read to mean that the record actually established the absence of third parties who could have been hit by a gunshot fired from that location.

[11] Many of the cases that consider the level of danger created by erratic or drunk driving nonetheless require some indicia of reliability to support allegations of reckless driving in a telephone tip. (E.g., *State v. Prendergast* (2004) 103 Hawai'i 451, 460–461 [83 P.3d 714,

case, however, even when we consider the danger posed to the other people in the park as a factor relevant to whether a reasonable suspicion existed, we conclude that the record contains insufficient evidence to distinguish *Florida v. J.L.*

Respondent argues that the tip was more detailed in this case than in *Florida v. J.L.* and was more reliable as a result. Here, the dispatcher told the officers that the suspect was wearing a black jacket, white shirt, tan pants and red boots and the gun was in the right pocket of the jacket.[12] In *Florida v. J.L.*, the officers were told that the suspect was wearing a plaid shirt but were given no information about where the gun was concealed. The additional details here about appellant's clothing made the identification of the person the informant intended to accuse more likely than in *Florida v. J.L.*, but it did not strengthen the weak inference that because the informant knew about the appearance of a person (information readily observable by the public), the informant also had knowledge of the concealed criminal activity alleged. Also, the allegation about the location of the gun was not sufficient to infer the tip was reliable and could be confirmed only after the stop and frisk had occurred.

## IV. *Conclusion*

■ The totality of the facts and circumstances known to the officer at the time of the stop and frisk of appellant was not sufficient to create a reasonable suspicion that appellant was engaged in criminal activity. Also, the parole search condition did not validate the stop, frisk and seizure. Accordingly, the motion to suppress should have been granted.[13]

---

723–724] [basis of 911 informant's knowledge of reckless driving clearly derived from contemporaneous personal observation; reliability of tip and imminence of danger distinguished case from *Florida v. J.L.*]; see generally Note, *Search and Seizure: Law Enforcement Officers' Ability to Conduct Investigative Traffic Stops Based Upon an Anonymous Tip Alleging Dangerous Driving When the Officers Do Not Personally Observe Any Traffic Violations* (2003) 34 U.Mem. L.Rev. 173, 191–193 [discussing cases that weigh danger when the anonymous tip alleges erratic or drunk driving].)

[12] As described in footnote 8, *ante*, we refrain from analyzing the impact of the informant's statement to the 911 operator that the man with the gun was "threatening to shoot people" because that information was not relayed to the officers in the field and the record was not developed on the issue of imputing the operator's knowledge to the officer who stopped appellant. (See *People v. Ramirez* (1997) 59 Cal.App.4th 1548, 1553–1556 [70 Cal.Rptr.2d 341] [discussing California cases concerning the collective knowledge of the police]; *People v. Poehner* (1971) 16 Cal.App.3d 481, 489 [94 Cal.Rptr. 94] [evidence must show it was reasonable for officer to rely on the information transmitted].)

[13] The motion to suppress did not address the exclusion of the handgun and statements by appellant in other contexts. (See *Pennsylvania Bd. of Probation and Parole v. Scott* (1998) 524 U.S. 357, 362–369 [141 L.Ed.2d 344, 118 S.Ct. 2014] [exclusionary rule does not apply in parole revocation hearings to evidence obtained by police through an illegal search].)

Respondent has not raised the issue of whether the record should be reopened on remand to allow additional evidence to be presented. Accordingly, in the event respondent seeks to present additional evidence on remand, the superior court shall decide that issue in the first instance.

## DISPOSITION

The judgment is reversed and the matter remanded to the superior court with directions to vacate its order denying the motion to suppress. If respondent seeks a new suppression hearing to present additional evidence to show that the warrantless stop and frisk of appellant was lawful, the question of whether to hold such a hearing shall be decided in the first instance by the superior court.

Vartabedian, Acting P. J., and Cornell, J., concurred.