117 P.3d 377 (2005)
STATE of Washington, Respondent,
v.
Luis Gustavo HOPKINS, Appellant.
No. 31299-9-II.
Court of Appeals of Washington, Division Two.
August 9, 2005.
*378 Stephanie C. Cunningham, Seattle, WA, for Appellant.
Kathleen Proctor, Pierce County Prosecuting Atty. Ofc., Tacoma, WA, for Respondent.
VAN DEREN, J.
¶ 1 Luis G. Hopkins challenges the trial court's denial of his suppression motion, arguing that an unreliable informant's tip did not justify the officers' investigatory stop. Holding that the officers did not have a reasonable suspicion to seize Hopkins, we reverse the trial court's denial of his suppression motion, vacate his convictions, and dismiss the charges with prejudice.

FACTS

A. Background
¶ 2 The police dispatch system informed two officers of a citizen informant's 911 call that reported a minor might be carrying a gun. The dispatch reported that the informant described the person as a "[l]ight-skinned black male, 17 [years of age], 5' 9", thin, Afro, goatee, dark shirt, tan pants, carrying a green backpack and a black backpack." Report of Proceedings (Nov. 18, 2003) (RP) at 10-11.[1] The informant reported that the person was "scratching his leg w/what looked like a gun." Plaintiff's Ex. 1. Approximately seven minutes later, the informant called again and asserted that the person was now at a pay phone at a certain address and that he thought the person put the gun in his pocket.
¶ 3 The police dispatch informed the officers that the caller was a citizen, but the dispatch did not provide the officers with a *379 name. A computer inside the officers' patrol car displayed an incident report indicating the informant's name and cell phone number and a different phone number for the second call. But the officers testified that they did not know the informant, did not know anything about the informant, and did not know if the informant knew Hopkins. One officer testified that the informant requested no contact, so the officer did not think there was any reason to contact him. Consequently, the officers did not attempt to contact the informant.
¶ 4 The officers went to the public pay phone at the location the informant identified. The officers saw a black male who resembled the informant's description hanging up the phone. One officer testified the person had his back to them. Neither officer observed a gun or any illegal, dangerous, or suspicious activity.
¶ 5 Based on the informant's tip, the officers approached Hopkins at the pay phone and ordered him to put his hands up in the air and keep them in sight. They then asked him if he had a gun. Hopkins responded that he might have a gun in his pocket. After a frisk, the officers discovered a loaded revolver in Hopkins' front pants pocket. The officers handcuffed Hopkins, placed him in the patrol car, and read his Miranda[2] rights. The officers asked Hopkins for identification and he provided a false name. The officers asked again for identification and discovered that Hopkins had several outstanding warrants and a prior felony conviction. The officers then arrested him.
¶ 6 The officers transported Hopkins to jail. Before booking him, an officer performed a search and discovered a small baggie containing a white powdered substance that was later tested to be approximately two-tenths of a gram of methamphetamine.

B. Procedural History
¶ 7 The State charged Hopkins with one count of unlawful possession of a controlled substance with a firearm enhancement, one count of making a false or misleading statement to a public servant, and one count of first degree unlawful possession of a firearm.[3]
¶ 8 Hopkins moved to suppress the evidence and statements gathered by the officers.[4] Hopkins argued that, "[t]he informant's tip in this case cannot form the basis for a reasonable suspicion [to justify an investigatory stop] because it lacked both (a) an indication that the informant was reliable and (b) an indication that the informant's information was reliable." Clerk's Papers (CP) at 7. Hopkins also argued that if the court granted his suppression motion, it must dismiss his charges under State v. Knapstad, 107 Wash.2d 346, 729 P.2d 48 (1986), "because without the illegally seized evidence, the State will be unable to make out a prima facie case." CP at 12 (emphasis in original).
¶ 9 At the CrR 3.6 suppression hearing, the officers testified that they did not contact the informant and that they knew nothing about him. One officer testified that she did not attempt to contact the informant because, "[t]he caller had requested no contact." RP at 20. The other officer testified that they did not know if the informant knew Hopkins. Both officers testified that they did not observe any criminal or suspicious behavior; rather, they saw a person who resembled the informant's description hang up the phone at a phone booth and they immediately contacted him. They approached Hopkins primarily out of officer safety because Hopkins was allegedly a minor with a gun. They did not see a bulge in Hopkins' pocket or other resemblance of a gun, nor did they see the gun until after the frisk.
¶ 10 The trial court denied Hopkins' suppression motion but stated that it was a "close case." RP at 49. The trial court questioned the reliability of the informant's *380 tip that initiated the officers' investigatory stop. The trial court stated,
Anybody seeing an acquaintance or someone who wanted to get Mr. Hopkins in trouble with the police could call up and say what he's wearing, he's got a gun. So the fact that somebody calls and says somebody has a gun doesn't allow the officers to stop them. And I was a little concerned. It sounds like the officers were assuming this anonymous tip must be correct. I thought maybe they gave it a little bit more weight than they should have because who knows who this guy is.
RP at 49 (emphasis added).
¶ 11 The trial court also found that, "[t]he officers d[id] not see Mr. Hopkins really do anything illegal. All they saw him do was hang up the telephone. There's nothing wrong with being on the phone." RP at 50.
¶ 12 But the trial court ultimately denied Hopkins' suppression motion by concluding,
[T]here is more than just an anonymous tip . . . when they approach Mr. Hopkins, he was asked, and I think the officers had every right to ask him if he had a gun.
He said, I might have a gun in my pocket . . . That's a statement from Mr. Hopkins that I think reasonably justifies them doing a little bit more.
RP at 49-50.
¶ 13 The trial court prefaced its oral ruling by noting, "I think maybe they [the officers] just assumed everything this guy told them, the tipster told them, was true. I don't know [if] they should necessarily assume that, but I don't think they did anything unreasonable here." RP at 51.
¶ 14 Consequently, the trial court entered written findings of fact and conclusions of law that included, inter alia, the following two legal conclusions: "1. Law enforcement lawfully contacted and detained the defendant based on the information provided by a named 911 caller. 2. The defendant was properly patted down after he indicated to the officers that he might have a gun in his pocket." CP at 176.
¶ 15 A jury found Hopkins guilty on all three counts, including the firearm enhancement. The trial court sentenced Hopkins to 60 months confinement.

ANALYSIS

I. INFORMANT'S TIP
¶ 16 Hopkins argues that the trial court erred when it denied his suppression motion based on an unreliable informant's tip to justify the officers' investigatory stop. The State responds that citizen informants are generally presumed to be reliable and that an informant's tip alleging unlawful firearm possession requires immediate police response.

A. Standard of Review
¶ 17 We review factual findings in a motion to suppress for substantial evidence; we review de novo the suppression order's conclusions of law. State v. Duncan, 146 Wash.2d 166, 171, 43 P.3d 513 (2002); State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999).
¶ 18 A warrantless, investigatory stop must be reasonable under the Fourth Amendment and article I, section 7 of the Washington State Constitution. Duncan, 146 Wash.2d at 171, 43 P.3d 513. The State must prove an investigatory stop's reasonableness. Duncan, 146 Wash.2d at 171, 43 P.3d 513. An investigatory stop is reasonable if the arresting officer can attest to specific and objective facts that provide a reasonable suspicion that the person stopped has committed or is about to commit a crime. State v. Armenta, 134 Wash.2d 1, 10, 948 P.2d 1280 (1997). An investigatory stop occurs at the moment when, given the incident's circumstances, a reasonable person would not feel free to leave. Armenta, 134 Wash.2d at 10, 948 P.2d 1280; State v. Williams, 102 Wash.2d 733, 739, 689 P.2d 1065 (1984).
¶ 19 An informant's tip can provide police a reasonable suspicion to make an investigatory stop. State v. Sieler, 95 Wash.2d 43, 47, 621 P.2d 1272 (1980). But the informant's tip must be reliable. Sieler, 95 Wash.2d at 47, 621 P.2d 1272. The State establishes a tip's reliability when "(1) the *381 informant is reliable and (2) the informant's tip contains enough objective facts to justify the pursuit and detention of the suspect or the noninnocuous details of the tip have been corroborated by the police thus suggesting that the information was obtained in a reliable fashion." State v. Hart, 66 Wash.App. 1, 7, 830 P.2d 696 (1992) (relying on Sieler) (emphasis in original).

B. Informant's Reliability
¶ 20 Generally, we may presume the reliability of a tip from a citizen informant. State v. Wakeley, 29 Wash.App. 238, 241, 628 P.2d 835 (1981). Here, the record demonstrates that at the time of the dispatch, the officers knew only that the informant was a citizen. Although the informant's name and cell phone number appeared on the officers' computer in their patrol car, they did not know the informant or the call's circumstances.[5] The officers did not attempt to call the informant back on his cell phone or the other number to obtain more information about his suspicions. Indeed, one officer believed she should not contact the informant because "[t]he caller had requested no contact." RP at 20. We agree with the trial court that the officers "just assumed everything this guy told them, the tipster told them, was true." RP at 51; see also Sieler, 95 Wash.2d at 47, 621 P.2d 1272.
¶ 21 The State emphasizes that a citizen informant is generally presumed reliable and that the informant called back a second time regarding the person's location. But as discussed above, the informant's name was meaningless to the officers and the mere fact that the informant called again to update the person's location is unpersuasive. It may mean that the informant is watching the person, but it tells the officers nothing more about the informant's reliability. Further, a named and unknown telephone informant is unreliable because "[s]uch an informant could easily fabricate an alias, and thereby remain, like an anonymous informant, unidentifiable." Sieler, 95 Wash.2d at 48, 621 P.2d 1272.
¶ 22 We hold that the State failed to establish the informant's reliability, thus it was reversible error to deny Hopkins' suppression motion. Hart, 66 Wash.App. at 7-8, 830 P.2d 696. But we also review whether the informant's tip included objective facts justifying the officers' investigative stop of Hopkins.

C. Reliability of Informant's Tip
¶ 23 The informant's tip contained inaccurate information about Hopkins' height, weight, and age, but the tip reasonably identified Hopkins' clothing, other physical features, and location. The informant's only allegation of criminal activity was that a minor was "scratching his leg" with "what appeared to be a gun," and that he "thinks" the gun is in Hopkins' right pocket. CP at 175; Plaintiff's Ex. 1.[6] But these facts alone fail to reliably provide an officer with reasonable suspicion of criminal behavior. It is undisputed that Hopkins was not a minor and that neither officer observed a gun. The officers did not observe any criminal or suspicious behavior because they saw Hopkins merely standing at a pay phone. And the Supreme Court has held that an anonymous tip asserting a person is carrying a gun is, without more, insufficient to justify an investigatory stop. See Florida v. J.L., 529 U.S. 266, 272, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.").
¶ 24 Citing Wakeley, the State emphasizes that the informant's tip involves the potentially dangerous situation of unlawful firearm possession. 29 Wash.App. at 241, 628 P.2d 835. But in J.L., the Supreme Court rejected *382 a similar argument, deciding that an automatic firearm exception to justify a stop "would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun." 529 U.S. at 272, 120 S.Ct. 1375. Further, Wakeley is distinguishable. Wakeley involved three citizen reports of gun fire in a residential area and the informants provided more personal information than here. 29 Wash.App. at 239, 241, 628 P.2d 835. And unlike here, the initial responding officer observed the suspect acting suspiciously before the investigatory stop. Wakeley, 29 Wash.App. at 242, 628 P.2d 835.
¶ 25 The trial court emphasized that it narrowly denied Hopkins' suppression motion. The trial court seriously questioned the reliability of the informant's tip and found that the officers did not observe illegal or suspicious behavior; however, it ultimately denied Hopkins' suppression motion based on his statement to police after the investigatory stop.
¶ 26 But the trial court erred in considering Hopkins' statement to police as justification of the investigatory stop because his statement occurred after the officers seized him. Before approaching Hopkins, the officers' suspicion was based solely on the informant's tip that described Hopkins' appearance and age inaccurately, but accurately described his location, clothing, and backpacks only. They relied on the informant's incorrect and vague assertion that Hopkins unlawfully possessed a gun as a minor and they did not observe any suspicious behavior. See, e.g., J.L, 529 U.S. at 271, 120 S.Ct. 1375 ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant.") (emphasis added). And immediately upon contact with the officers, Hopkins was not free to leave because the officers required Hopkins to put his hands in the air.
¶ 27 Under these circumstances, we hold that the informant's tip alone failed to provide the officers a reasonable suspicion to justify an investigatory stop of Hopkins. We agree with Hopkins that "Essentially, the trial court found that, even though the officers probably should not have presumed that the caller was reliable, and even though the information did not provide sufficient basis to stop Hopkins, they were justified in detaining and questioning Hopkins anyway." Br. of Appellant at 10.
¶ 28 Thus, we reverse the trial court's denial of Hopkins' suppression motion. Because the State's case rested exclusively on the improperly seized evidence and his statements after the illegal stop, we vacate Hopkins' convictions and dismiss the charges with prejudice.
I concur: MORGAN, J.
QUINN-BRINTNALL, C.J. (dissenting).
¶ 29 This appeal presents the following question: Is it reasonable for police to consider a citizen report of a crime in progress reliable, as opposed to a mischievous prank, when an individual calls 911 to report what he apparently believes is a crime, gives his name, location, and phone number, and then calls back with another phone number to tell police the suspect's exact location? The majority says no. Because I believe that this answer is wrong and can only serve to undermine effective law enforcement and 911's usefulness, I respectfully dissent.
¶ 30 The tip from 911 caller Roger Bratsch was sufficient to justify a Terry[7] stop of Hopkins if (1) the officers could reasonably believe that Bratsch was credible and (2) the tip contained enough objective facts to reasonably believe that criminal activity was afoot. State v. Sieler, 95 Wash.2d 43, 47-48, 621 P.2d 1272 (1980). These requirements, which give a tip sufficient indicia of reliability, must be "considered in the `totality of the circumstances  the whole picture.'" State v. Randall, 73 Wash.App. 225, 229, 868 P.2d 207 (1994) (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).
*383 ¶ 31 The majority addresses both requirements, but this appeal turns on the first. If Bratsch was credible, the officer could reasonably believe that Hopkins was committing a crime: Bratsch reported seeing Hopkins, who he believed to be a minor, displaying a gun; minors are generally prohibited from possessing a gun under RCW 9.41.040(2)(a). According to the majority, Bratsch's tip did not contain enough objective facts to reasonably believe that Hopkins was committing a crime because the officers did not see Hopkins carrying the gun and Hopkins was in fact not a minor; thus, his gun possession might have been lawful. But neither circumstance makes Bratsch's tip less credible or the officer's decision to investigate the report unreasonable. Whether the officers saw the gun is irrelevant if Bratsch's tip was credible: Articulable suspicion, not probable cause, triggers law enforcement's duty to investigate criminal activity, and Bratsch's report was not stale as he reported seeing the gun only nine minutes before the officers stopped Hopkins. See Adams v. Williams, 407 U.S. 143, 145-46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). And that Hopkins was in fact 21 years of age does not make it unreasonable for Bratsch and the police to believe that he looked like a minor.[8]
¶ 32 The reasonableness of the police conduct here hinges on whether Bratsch was credible. An informant's credibility turns on the reasonableness of concluding, under the totality of the circumstances, that the informant is not a fallacious troublemaker or one relying on casual rumor or irresponsible conjecture. State v. Northness, 20 Wash.App. 551, 556-57, 582 P.2d 546 (1978). This threshold is greatly relaxed when the informant is an identifiable and disinterested citizen, as opposed to an anonymous or professional informant. Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); State v. Cole, 128 Wash.2d 262, 287, 906 P.2d 925 (1995). An informant who puts his anonymity at risk "must, as a general matter, be thought more reliable than an anonymous ... tipster, for the former runs the greater risk that he may be held accountable if his information proves false." United States v. Salazar, 945 F.2d 47, 51 (2nd Cir.1991), cert. denied, 504 U.S. 923, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992); accord J.L., 529 U.S. at 275-76, 120 S.Ct. 1375 (Kennedy, J., concurring); People v. Jordan, 121 Cal.App.4th 544, 561, 17 Cal.Rptr.3d 157 (Cal.Ct.App.2004) ("As anonymity decreases and the informant's risk of accountability increases, the inference that the tip is reliable strengthens.").
¶ 33 The facts of this case closely mirror those in United States v. Terry-Crespo, 356 F.3d 1170 (9th Cir.2004). There, an individual called 911 to report that he had been threatened with a gun by a young Hispanic male dressed in gang clothing and carrying a backpack. The person gave his name but no phone number and he indicated that he did not want police to contact him. Based on this tip alone, the police stopped and eventually arrested Terry-Crespo.
¶ 34 On appeal, Terry-Crespo argued, like Hopkins does here, that the police did not have a basis to believe that the 911 caller was credible. The Ninth Circuit disagreed:
Mr. Domingis's 911 call prior to the Terry stop was entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch.... Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the 911 system's usefulness.... The touchstone of our search and seizure jurisprudence remains the Fourth Amendment's textual requirement that any search be "reasonable," a determination we make by weighing the competing interests of individual security and privacy with the need to promote legitimate governmental interests. Having weighed those interests, we conclude that it is reasonable to accommodate the public's need for a prompt police response....
....
[Also], the fact that Mr. Domingis risked any anonymity he might have enjoyed and exposed himself to legal sanction further *384 supports the tip's reliability.... Mr. Domingis jeopardized any anonymity he might have had by calling 911 and providing his name to an operator during a recorded call.... Merely calling 911 and having a recorded telephone conversation risks the possibility that the police could trace the call or identify Mr. Domingis by his voice. Moreover, the district court could consider the 911 call reliable because Mr. Domingis risked criminal sanction for any false report to police.
Terry-Crespo, 356 F.3d at 1176 (citations omitted). In addition, the court also noted that the police could place additional reliability on the tip because it evidenced first-hand information that was only a few minutes old. Terry-Crespo, 356 F.3d at 1176-77.
¶ 35 I find persuasive the Ninth Circuit's conclusion that 911 calls have a heightened reliability. This conclusion is shared elsewhere.[9] It is well understood in today's society that 911 calls are recorded, that information about the source of a call is obtained, and that it is a crime to initiate false statements to 911 dispatchers and law enforcement. State v. Williams, 241 Wis.2d 631, 678, 623 N.W.2d 106 (Prosser, J., concurring), cert. denied, 534 U.S. 949, 122 S.Ct. 343, 151 L.Ed.2d 259 (Wis.2001). "One who dials 911 from a private phone is traceable, and does place credibility at risk in a way that an unidentifiable caller from a public phone does not." State v. Gomez, 198 Ariz. 61, 64, 6 P.3d 765 (Ariz.Ct.App.2000); see generally United States v. Nelson, 284 F.3d 472, 482-83 (3rd Cir.2002) (caller not anonymous when he calls private police number known only to family members and informants and requests a certain officer but refuses to give his name). cert. denied, 537 U.S. 940, 123 S.Ct. 50, 154 L.Ed.2d 245 (2002). Thus, 911 calls have a reduced credibility threshold. 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.5(h), at 597-98 (2004); see also State v. Golotta, 178 N.J. 205, 219, 837 A.2d 359 (N.J.2003) ("[T]he State stands on firm constitutional ground when it treats the anonymous 9-1-1 caller in the same fashion as it would an identified citizen.").
¶ 36 This status for 911 calls is consistent with the permitted consideration of a tipster's state of mind in assessing credibility. See State v. Lair, 95 Wash.2d 706, 710, 630 P.2d 427 (1981) ("[E]ven if nothing is known about the informant, the facts and circumstances under which the information is furnished may reasonably support an inference that the informant was telling the truth."). We consider credibility to be enhanced when an informant's tip is against his own penal interest. State v. Estorga, 60 Wash.App. 298, 304, 803 P.2d 813, review denied, 116 Wash.2d 1027, 812 P.2d 102 (1991). Similarly, police may also consider whether the informant is under arrest, for one who knows the police are already in a position to charge him with a serious crime will not lightly undertake to divert the police down blind alleys. State v. O'Connor, 39 Wash.App. 113, 121, 692 P.2d 208 (1984), review denied, 103 Wash.2d 1022 (1985). Like these factors, an individual's decision to use 911 in reporting his tip enhances his credibility because he knows that he can be tracked down and prosecuted if he provides misinformation.
¶ 37 By ignoring Bratsch's means for communicating his tip, the majority also undermines the 911 system. The majority suggests that the responding officers should have investigated Bratsch before relying on his tips. But police delay while attempting to verify or corroborate a 911 emergency tip of an armed minor on a public street is, in my view, unreasonable and likely to prove costly to public safety and the 911 system's usefulness. Terry-Crespo, 356 F.3d at 1176. The constitution "is not a suicide pact"[10] which bars considerations of exigency and *385 public safety in evaluating the reasonableness of police conduct. New York v. Quarles, 467 U.S. 649, 656, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); State v. Finch, 137 Wash.2d 792, 829, 975 P.2d 967, cert. denied, 528 U.S. 922, 120 S.Ct. 285, 145 L.Ed.2d 239 (1999). Case law "recognize[s] the serious threat that armed criminals pose to public safety." J.L., 529 U.S. at 272, 120 S.Ct. 1375. Thus, while assessing an informant's credibility cannot be ignored whenever an exigency arises, J.L., 529 U.S. at 273-74, 120 S.Ct. 1375, the threshold for satisfying such an assessment is tempered in light of the exigency. Ultimately, the question is the reasonableness of the officer's appraisal of the reliability of the information in light of the circumstances presented. State v. Glover, 116 Wash.2d 509, 514, 806 P.2d 760 (1991).
¶ 38 Here, Bratsch called 911, and gave dispatch his name, phone number, and location. Although Bratsch stated a preference not to be involved, his 911 calls demonstrated serious concern for public safety and an implicit understanding that he would be involved if necessary. Williams, 241 Wis.2d at 649, 623 N.W.2d 106. I also note that Bratsch's tip was not generic: He specifically described Hopkins and stated that Hopkins was using a gun to scratch his leg. O'Connor, 39 Wash.App. at 122, 692 P.2d 208 ("[T]he amount and kind of detailed information given by an informant may also enhance his reliability."). Perhaps most significantly, Bratsch demonstrated his own concern for public safely by following Hopkins so he could keep police apprised of Hopkins's location. Bratsch's decisions to make a second call to 911 from another traceable number and to follow an individual he saw carrying a gun only added to the inference that he was acting as an ordinary and concerned citizen. In my opinion, under the facts of this case, the police reasonably believed that Bratsch was reliably recounting criminal activity in progress, and they acted accordingly in stopping Hopkins to investigate.
¶ 39 For these reasons, I dissent.
NOTES
[1] Hopkins is 21 years old, six-feet three inches tall, and weighs 200 pounds.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] The State's unlawful firearm possession charge was under RCW 9.41.040(1)(a) because of Hopkins' prior convictions of a "serious offense."
[4] Hopkins does not challenge the trial court's admissibility of his statements under CrR 3.5. The trial court's decision under CrR 3.6 preceded the CrR 3.5 proceeding.
[5] We note that the officers' testimony at the suppression hearing indicates that, before the investigatory stop, they did not meaningfully review the incident report on the patrol car's computer. Instead it appears the officers relied primarily on the information from the dispatcher that reported the defendant's description and did not state the informant's name.
[6] One officer testified that the second call asserted the gun was in the right pocket, but the dispatch report provides that the caller thinks the gun is in the right pocket.
[7] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[8] Tobacco retailers generally request identification well after an individual turns 18.
[9] See, e.g., United States v. Quarles, 330 F.3d 650, 654-56 (4th Cir.), cert. denied, 540 U.S. 977, 124 S.Ct. 459, 157 L.Ed.2d 331 (2003); United States v. Wheat, 278 F.3d 722, 735-36 (8th Cir.2001), cert. denied, 537 U.S. 850, 123 S.Ct. 194, 154 L.Ed.2d 81 (2002); State v. Gomez, 198 Ariz. 61, 64, 6 P.3d 765 (Ariz.Ct.App.2000); Jordan, 121 Cal.App.4th at 561, 17 Cal.Rptr.3d 157; State v. Golotta, 178 N.J. 205, 218-19, 837 A.2d 359 (N.J.2003); People v. Dixon, 734 N.Y.S.2d 761, 762, 289 A.D.2d 937 (N.Y.App.Div.2001); State v. Williams, 241 Wis.2d 631, 649, 651, 667-78, 623 N.W.2d 106, cert. denied, 534 U.S. 949, 122 S.Ct. 343, 151 L.Ed.2d 259 (Wis.2001).
[10] Kennedy v. Mendoza-Martinez, 372 U.S. 144, 160, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).