[No. B159423. Second Dist., Div. Five. Aug. 13, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
PERRY BUTLER, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B., III.C. and III.D.

Counsel

David L. Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Stephen A. McEwen and G. Tracey Letteau, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

**TURNER, P. J.—**

## I. INTRODUCTION

Defendant, Perry Butler, appeals from his conviction for battery on a peace officer, with injuries. (Pen. Code, § 243, subd. (c)[1].) The jury also found that defendant was previously convicted of a serious felony. (§§ 667, subds. (b)–(i), 1170.12.) Defendant argues the trial court improperly: denied his section 1538.5 motion to suppress evidence; excluded evidence that deputy sheriffs had tried to intimidate him prior to trial; and denied his discriminatory prosecution discovery motion. In the published portion of this opinion, we discuss whether the United States Supreme Court decision of *Florida v. J.L.* (2000) 529 U.S. 266, 268–274 [146 L.Ed.2d 254, 120 S.Ct. 1375] (*J.L.*) required the trial court to suppress the challenged evidence under the terms of the Fourth Amendment. We conclude that *J.L.*, does not require that the evidence at issue be suppressed, and the trial court correctly denied the section 1538.5 motion.

## II. FACTUAL BACKGROUND

◼ We view the evidence in a light most favorable to the judgment. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [61 L.Ed.2d 560, 99 S.Ct. 2781]; *People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

P.2d 640]; *Taylor v. Stainer* (9th Cir. 1994) 31 F.3d 907, 908–909.) On September 6, 1997, Los Angeles County Deputy Sheriff James Mumby, while working at the Palmdale substation, received an anonymous telephone call from a woman. The woman told Deputy Mumby that she believed drugs were being sold from a gray Ford Explorer parked across from 933 East Avenue Q-4. Deputy Mumby typed the message given into the computer that was transmitted to all mobile units to "be on the lookout." The message included information regarding possible narcotics activity at the place described by the anonymous caller.

Deputy Patrick Hayes received the mobile unit message sent by Deputy Mumby. Deputy Hayes drove to the area of 933 East Avenue Q-4, where he saw a gray Ford Explorer parked at the curb. Deputy Hayes parked his patrol car behind the Explorer. Deputy Hayes saw a woman standing at the driver's door of the Explorer. The driver's door window was down. Deputy Hayes saw defendant, who was in the driver's seat, hand something to the woman standing outside. Deputy Hayes observed that the registration tag on the Explorer had expired. A woman was seated in the front passenger seat of the Explorer. Deputy Hayes saw defendant place something else in the hand of the woman outside his door. Deputy Hayes knew this area to be a high-crime area within the City of Palmdale. Deputy Hayes walked up to the driver's side door of the Explorer. The woman standing outside the door walked away toward a nearby market.

Deputy Hayes greeted defendant. Deputy Hayes then asked defendant to turn off the motor of the Explorer. The driver's window was open. Defendant was not wearing a shirt. Deputy Hayes saw that defendant was a very muscular man. Defendant's left hand was down to his side between the door and his body. Deputy Hayes was concerned that defendant might be holding something. Defendant's arm was tensed. Defendant was asked if the Explorer belonged to him. Defendant said that it did. When asked if he had a driver's license or identification card, defendant gestured as though he did not have either. Defendant began looking through the center console with his right hand. Defendant eventually brought out a California identification card. Deputy Hayes clipped the identification card to his shirt. Defendant asked what the problem was. Defendant was told that someone had called and said he was doing something he was not supposed to be doing. Defendant asked if he was under arrest. Defendant was told he was not under arrest but was being detained. Defendant became argumentative, repeatedly asking if he were under arrest. Defendant's left hand remained at his side. Defendant used his right hand to reach into the center console again. Deputy Hayes became concerned for his safety. Deputy Hayes believed defendant could have been reaching for a weapon.

Defendant brought his left hand into view. Defendant's left hand was closed as if he was holding something. Deputy Hayes believed defendant might be holding some type of narcotic. Deputy Hayes reached inside the window and lightly grasped defendant's left wrist. Defendant continued to reach into the console with his right hand. Deputy Hayes removed his weapon from his holster with his right hand and held it at his side. Defendant was asked to open his left hand to reveal what he was holding. Defendant did not comply. Rather, defendant continued to inquire whether he was under arrest. Deputy Hayes repeated that defendant was being detained rather than arrested. Eventually defendant brought his right hand into view. Defendant was not holding anything in his right hand. Deputy Hayes returned his weapon to his holster. Deputy Hayes continued to hold onto defendant's left wrist. Defendant began to pull his left hand toward his own body. Deputy Hayes testified, "At that time I grasped a little bit stronger with my grip and held the grip on his wrist." Defendant again repeated, "Am I under arrest?" Deputy Hayes used his right hand to activate his radio microphone to summon assistance. Defendant said: "Hurry up. Go ahead ... call them. Tell them to hurry up and get here."

Deputies Richard Ellis, Gregory Minster, and Jeffrey Biehl responded to the assistance request. Deputy Ellis parked his patrol car at an angle in front of the Explorer. This was to ensure that defendant could not drive away as well as to be out of the line of fire if a shooting occurred. Once the deputies arrived, Deputy Hayes ordered defendant to get out of the Explorer several times. A heated discussion followed. Defendant refused to get out of the truck. Defendant said, "Fuck you" several times. Defendant used his right hand to press the power window switch. As the window went up, defendant pulled Deputy Hayes's arm inside the truck. Deputy Ellis removed his can of pepper spray. Deputy Ellis then sprayed a short burst into defendant's face. Defendant closed his eyes and remained very still. Deputy Hayes removed his arm from the window.

Defendant reached for the ignition. The doors of the Explorer were locked. The woman opened the passenger door and got out of the truck. As noted previously, there was a woman in the front seat of the Explorer. Deputies Hayes and Ellis ran to the passenger door while Deputies Minster and Biehl remained on the driver's side. Deputy Ellis detained the woman. Deputies Minster and Biehl again ordered defendant out of the truck. Defendant appeared to be leaning forward in an attempt to clear his eyes. Deputy Minster said, "He has dope, " or "He's eating dope." Defendant appeared to swallow something. In the meantime, Deputy Hayes reached inside the truck and removed the keys from the ignition and unlocked the doors.

The driver's side door flew open. Defendant lowered his head and "charged out." Defendant charged towards Deputy Biehl. Deputy Biehl reholstered his

weapon. As this was occurring, defendant slugged Deputy Biehl. Defendant used his left fist. Defendant also headbutted Deputy Biehl. Deputy Biehl was headbutted on his right cheek. Deputy Biehl used a flashlight to strike defendant on the arm or shoulder. Deputy Minster heard something hit the ground and later observed a glass pipe. Deputy Minster saw that defendant did not have a gun. Deputy Minster reholstered his weapon. Defendant grabbed Deputy Minster's hand, squeezed down, and then pulled up. Deputy Minster hit defendant three times in the face. This was done to keep him from getting the gun. Defendant pulled Deputy Minster's thumb upward causing intense pain. Deputy Biehl saw defendant reaching toward Deputy Minster's gun. Deputy Biehl believed defendant intended to use deadly force. Deputy Biehl believed defendant was attempting to grab Deputy Minster's gun. Deputy Biehl hit defendant on the top of the head with a flashlight.

Defendant fell to the ground. Deputy Hayes and other deputies handcuffed defendant. Defendant had resisted being handcuffed by placing his arms under his body. Defendant had a cut on the top of his head that was bleeding. Deputy Hayes summoned paramedics. Thereafter, defendant was treated by paramedics and driven to the hospital. Emergency Medical Technician Francisco Flores treated defendant at the scene. Mr. Flores noted that defendant was uncooperative in answering basic questions related to medical treatment. Defendant had an unsteady gait when he walked to the hospital bed and had an odor of alcohol on his breath. Mr. Flores believed that defendant may have been acting. Defendant was treated at the hospital for his head laceration. Defendant also incurred bruising on his cheek and earlobe as well as cuts within his ear.

Deputy Minster was also taken to the hospital for treatment of injuries to his thumb and knee. Deputy Minster suffered a sprained ligament in his hand as well as water on the knee. Deputy Minster missed 22 days of work as a result of his injuries.

## III. DISCUSSION

### A. *Section 1538.5 Hearing*

#### 1. *Factual and Procedural Background*

Prior to trial, defendant filed a motion to suppress evidence pursuant to section 1538.5, subdivision (a)(1). Defendant subsequently filed a supplemental suppression motion in which he sought to suppress the observations and testimony of various sheriff's deputies because the "stop and detention" were unlawful.

We review the evidence in a light favorable to the trial court's ruling. (*Guidi* v. *Superior Court* (1973) 10 Cal.3d 1, 10, fn. 7 [109 Cal.Rptr. 684,

513 P.2d 908]; *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649] [appellate court is bound to "view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence"].) At the hearing on the motion to suppress evidence pursuant to section 1538.5, the prosecution presented evidence regarding defendant's detention and subsequent arrest. Deputy Mumby testified that at 6:30 p.m. he received an anonymous tip from an unknown female caller while working at the Palmdale facility. Deputy Mumby believed the woman was Hispanic. The unidentified caller told Deputy Mumby that a Black male in a gray Ford Explorer was parked across from 933 East Avenue Q-4. It appeared to her that the man was selling drugs. The incoming telephone call was not received on a telephone line where the conversation was tape-recorded. The woman refused to give her telephone number and address to Deputy Mumby. Deputy Mumby transmitted the information to field units by way of a mobile digital terminal computer system.

Deputy Hayes received the computer transmission from Deputy Mumby regarding possible narcotics activity and drove to the address mentioned by the caller. The one line computer message indicated, "[T]here was narcotics activity occurring in front of 933 East Avenue Q-4." The computer message indicated a gray Ford Explorer was involved in the drug activity. Deputy Hayes had received training in recognizing drug transactions. Deputy Hayes had watched as many as 30 drug transactions.

As Deputy Hayes turned onto Avenue Q-4, he saw a gray Ford Explorer parked on the street approximately two and one-half feet from the curb. The engine of the Explorer was still running. Parking a car more than 18 inches from a curb is a violation of Vehicle Code section 22502, subdivision (a).[2] Deputy Hayes saw a woman standing outside the driver's door. Deputy Hayes saw what appeared to be a hand-to-hand transaction between the woman and defendant, who was in the driver's seat. The man handed something to the woman. Likewise, the woman handed something to the driver of the Explorer. Based on what he saw, Deputy Hayes believed that the exchange was possibly a narcotics transaction. Deputy Hayes drove his black-and-white patrol car behind the Explorer and turned on the flashing amber lights. Deputy Hayes saw a woman in the passenger seat of the Explorer. Deputy Hayes asked defendant for a driver's license. Defendant asked if there was a problem. Deputy Hayes described his response as follows, "I told him that somebody had said he was doing something he wasn't supposed to be doing."

---

[2] Vehicle Code section 22502, subdivision (a) states in part: "Except as otherwise provided in this chapter every vehicle stopped or parked upon a roadway where there are adjacent curbs shall be stopped or parked with the right-hand wheels of such vehicle parallel with and within 18 inches of the right-hand curb ...."

Defendant kept his left hand down to his side. Defendant fumbled in the center console and eventually produced a driver's license. Deputy Hayes asked defendant to turn off the truck's engine. Defendant complied. Thereafter, Deputy Hayes looked at defendant's left hand. Defendant's left hand was clenched into a fist as if he were holding something. When asked to show what he had in his hand, defendant asked if he was under arrest and pulled his hand across his body. Deputy Hayes reached inside the open window and took a light hold of defendant's left wrist. Defendant was then asked to open his hand. Defendant refused to do so and again asked if he was under arrest. Defendant then reached into the center console with his right hand. Defendant appeared to be "fumbling" or "digging for something." Deputy Hayes feared defendant might be reaching for a weapon. Deputy Hayes drew his weapon. Defendant was repeatedly ordered to "show" both of his hands. After several commands, defendant complied. Defendant did not have a weapon in his right hand. Deputy Hayes then returned his weapon to its holster. Deputy Hayes spoke into his radio and requested assistance. Defendant said, "Yeah, go ahead and call them; tell them to hurry up and get here." Deputy Hayes continued to grip defendant's left wrist. Defendant continued to refuse to open his closed left fist.

After one to two minutes, Deputies Minster and Biehl arrived. Deputies Minster and Biehl arrived around 6:30 p.m. Defendant was asked to open his left hand and step outside the truck. Defendant refused to do either. Defendant used his right hand to activate the power window switch to close the window. Defendant pulled Deputy Hayes's arm into the truck. Deputy Hayes described what occurred then: "Fearing that my arm was going to be pinched in the window, I released my grip on his left hand, pulled my hand back .... At the same time, I saw that he was reaching for the ignition, and Deputy Ellis sprayed [defendant] in the face with some ... pepper spray." The passenger got out of the Explorer. Deputies Hayes and Ellis moved to the passenger side. Deputy Ellis detained the woman while Deputy Hayes reached inside the Explorer and removed the keys from the ignition.

Deputy Minster saw defendant bend down. As he did so, defendant placed something in his mouth. Defendant sat up and swallowed. Deputy Hayes heard one of the deputies say that defendant was "chewing the dope." Defendant forced the driver's door open. As he did so, a glass pipe, like those used to ingest narcotics, fell to the ground. Deputy Minster reholstered his gun. As this was occurring, defendant grabbed the top of Deputy Minster's hand. Defendant began squeezing Deputy Minster's hand and pulling up. Deputy Minster hit defendant in the face two or three times. Deputy Minster was holding onto his gun. As just noted, Deputy Minster's right hand was holding onto his gun. Defendant pulled Deputy Hayes's thumb up, causing pain. Defendant fell to the ground and was handcuffed by another deputy.

At the suppression of evidence hearing, Carissa Maldonado. a defense witness, testified that while she was on her way to a market on September 6, 1997, she saw defendant parked nearby. Ms. Maldonado asked defendant for some change so that she could buy some juice. Defendant gave her change and asked her to buy him a beer as well. Ms. Maldonado went into the store. Because she did not know what size beer defendant wanted, she returned to defendant's truck and asked him. Defendant told her he wanted the 32-ounce size and gave her additional change. Thereafter, a sheriff's car drove up. Ms. Maldonado stepped away from the Explorer and went into the store. Ms. Maldonado saw some deputies speaking to defendant. Other sheriff's cars came shortly thereafter and surrounded the Explorer. Ms. Maldonado saw the deputies handcuffing defendant. Defendant was asking: "What did I do? What did I do?"

In denying the section 1538.5 motion, the trial court stated: "Now as I said before, I have listened very carefully to the testimony of five witnesses. I have considered the above-mentioned exhibits that were admitted. We have been here for three days. I have done my best to listen carefully to the testimony and observe the witnesses as they testify. This is a situation in which we all agree there was an anonymous tip. We all agree, I would think, that pursuant to [*J. L., supra,* 529 U.S. 266], and other authorities as well, an anonymous tip alone won't suffice. Certainly, we would all agree, I would think, there is a duty to follow up in connection with this anonymous tip. That is what Deputy Hayes did. He got to the location, and he testified that he observed what he thought might be an illegal drug transaction. He saw some sort of hand-to-hand transaction. Now he testified that he trained at the academy, that he had been involved in investigations of this type before. I would respectfully suggest to you, [defendant], that there is no absolute qualification to reach the conclusion that Deputy Hayes reached based on the observations that he made. However, in the court's view, the anonymous tip, plus those observations, the hand-to-hand transaction, combined in small mea sure, I repeat, the fact that it was a nighttime type situation in an area, apparently relatively high crime area, all of those facts and circumstances together—[¶] … [¶] Deputy Hayes testified that he could not identify what was being exchanged, but, of course, there is no requirement in a situation like this one that the investigating officer be able to identify what it is that is exchanged." The trial court then noted the discrepancies in the testimony, but clarified that they were not central to the suppression motion. The trial court continued, "I'm finding, following a hearing, that it was reasonable, based on the observations, based on the tip, to continue the investigation to go to the driver's side door, to make the inquiries that were made, and certainly, based on [defendant's] response … Deputy Hayes, was not in a situation in which he could comfortably leave the location. [¶] So whether this began as a consensual encounter or was a lawful detention at the outset, I don't believe makes a

difference, given the court's finding that the tip and the observations did give rise to a reasonable suspicion and did give rise to a lawful detention, an investigative stop, a Terry stop, of the type that took place here. [¶] ... [¶] Now the standard here in a warrantless search situation is the People's burden is to establish the lawfulness and the reasonableness of the search or seizure. Here we are talking about observations by a preponderance of the evidence. Court's finding is that I'm comfortable by that standard, by a preponderance of the evidence, that the actions of Deputy Hayes were reasonable."

### 2. *Defendant was properly detained*

The United States Supreme Court has identified the applicable standards of review as follows for challenges to the legality of a detention: "The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: '[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.' *Pullman-Standard v. Swint* [(1982)] 456 U.S. 273, 289, n. 19 [72 L.Ed.2d 66, 102 S.Ct. 1781]. [¶] We think independent appellate review of these ultimate determinations of reasonable suspicion and probable cause is consistent with the position we have taken in past cases. We have never, when reviewing a probable-cause or reasonable-suspicion determination ourselves, expressly deferred to the trial court's determination.... [¶] We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be re- viewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers. [¶] A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." (*Ornelas v. United States* (1996) 517 U.S. 690, 696–697, 699 [134 L.Ed.2d 911, 116 S.Ct. 1657]; see *People v. Cromer* (2001) 24 Cal.4th 889, 894 [103 Cal.Rptr.2d 23, 15 P.3d 243].) The California Supreme Court has never explicitly applied *Ornelas* to a Fourth Amendment suppres- sion of evidence issue. But the California Supreme Court's description of the standard of review in Fourth Amendment cases virtually mirrors the *Ornelas*

language. (*People v. Alvarez* (1996) 14 Cal.4th 155, 182 [58 Cal.Rptr.2d 385, 926 P.2d 365]; *People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].)

Defendant argues that because he was initially unreasonably detained, the subsequent observation of the victim, Deputy Minster, and the other deputies should have been suppressed. In *United States v. Arvizu* (2002) 534 U.S. 266, 273–274 [151 L.Ed.2d 740, 122 S.Ct. 744], the United States Supreme Court set forth applicable Fourth Amendment jurisprudence in the context of a temporary detention: "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry v. Ohio*, 392 U.S. 1, 9 [20 L.Ed.2d 889, 88 S.Ct. 1868] (1968); *United States v. Cortez*, 449 U.S. 411, 417 [66 L.Ed.2d 621, 101 S.Ct. 690] (1981). Because the 'balance between the public interest and the individual's right to personal security,' *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 [45 L.Ed.2d 607, 95 S.Ct. 2574] (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity ' "may be afoot," ' *United States v. Sokolow*, 490 U.S. 1, 7 [104 L.Ed.2d 1, 109 S.Ct. 1581] (1989) (quoting *Terry*, *supra*, at 30). See also *Cortez*, 449 U.S., at 417 ('An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity'). [¶] When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing. See, e.g., *id.*, at 417–418. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' *Id.*, at 418. See also *Ornelas v. United States*, [*supra*,] 517 U.S. [at] 699 (reviewing court must give 'due weight' to factual inferences drawn by resident judges and local law enforcement officers). Although an officer's reliance on a mere ' "hunch" ' is insufficient to justify a stop, *Terry*, *supra*, at 27, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow*, *supra*, at 7."

We turn now to the application of *J.L.* In *J.L.*, the United States Supreme Court held that an "anonymous tip," similar to the one received by Deputy Mumby in this case, was insufficient to conduct a temporary detention and patdown search of a suspect. (*J.L.*, *supra*, 529 U.S. at p. 268.) The entirety of the facts in *J.L.* was as follows: "On October 13, 1995, an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.... So far the record as

reveals, there is no audio recording of the tip, and nothing is known about the informant. Sometime after the police received the tip—the record does not say how long—two officers were instructed to respond. They arrived at the bus stop about six minutes later and saw three black males 'just hanging out [there].'... One of the three, respondent J.L., was wearing a plaid shirt. ... Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct. The officers did not see a firearm, and J.L. made no threatening or otherwise unusual movements."... One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket. The second officer frisked the other two individuals, against whom no allegations had been made, and found nothing." (*Ibid.*)

In *J.L.*, the Supreme Court distinguished that case from its prior holding in *Alabama v. White* (1990) 496 U.S. 325, 329–333 [110 L.Ed.2d 301, 110 S.Ct. 2412] where it held that there was sufficient corroboration of information provided by an unknown informant to permit a temporary detention. In *J.L.*, the Supreme Court distinguished *White* as follows: "As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' [Citation]. The question we here confront is whether the tip pointing to J.L. had those indicia of reliability. [¶] In *White*, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel. [Citation.] Standing alone, the tip would not have justified a *Terry* stop. [Citation.] Only after police observation showed that the informant had accurately predicted the woman's movements, we explained, did it become reasonable to think the tipster had inside knowledge about the suspect and therefore to credit his assertion about the cocaine. [Citation.] Although the Court held that the suspicion in *White* became reasonable after police surveillance, we regarded the case as borderline. Knowledge about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. We accordingly classified *White* as a 'close case.' [Citation.]" (*J.L.*, supra, 529 U.S. at pp. 270–271.)

J.L. does not require reversal. Unlike the extremely limited facts concerning the detention in *J.L.*, in this case: the source of the information—a person unwilling to reveal her identity, and an explanation as to why her identity—was unknown was testified to by Deputy Mumby; the time the telephone call was received and the computer message transmitted was closely correlated with the commencement of the detention; upon arriving at the place described by the caller, Deputy Hayes saw that defendant's Explorer

matched the description and was at the place described in the telephone call; upon arriving, Deputy Hayes saw conduct he believed, based on his training and experience, was a drug transaction—the criminal conduct explicitly alleged in the telephone call. This was sufficient to justify a temporary detention. (*People v. Ramirez* (1996) 41 Cal.App.4th 1608, 1611–1612 [49 Cal.Rptr.2d 311] [pre-*J.L.* case where an anonymous tip was sufficiently corroborated by conduct officers reasonably believed based on their training was a drug transaction].) No doubt, the telephone call by itself was insufficient to justify a temporary detention under the controlling authority of *J.L.* (*People v. Saldana* (2002) 101 Cal.App.4th 170, 174 [123 Cal.Rptr.2d 763] [applying *J.L.* and holding that a telephonic tip from an unknown informant was insufficient by itself to justify a detention]; cf. *People v. Coulombe* (2000) 86 Cal.App.4th 52, 58 [102 Cal.Rptr.2d 798] [applying *J.L.* and holding that two separate informants providing information in person to an officer was sufficient to justify a detention].) But when the totality of the circumstances are considered and giving deference to Deputy Hayes's experience and specialized training, no Fourth Amendment violation occurred when defendant was detained. *J.L.* does not require reversal. Given our resolution in this case, we need not address the other issues raised by the parties. Additionally, we need not address whether the Fourth Amendment exclusionary rule can apply to exclude testimony by a crime victim of an assault by an accused. (*United States v. Ceccolini* (1978) 435 U.S. 268, 276–279 [55 L.Ed.2d 268, 98 S.Ct. 1054] [testimony by a witness acting on her own free will not subject to exclusionary rule].)

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The imposition of a Health and Safety Code section 11372.5, subdivision (a) laboratory fee is reversed. The judgment is affirmed in all other respects.

Armstrong, J., concurred.

A petition for a rehearing was denied September 4, 2003, and on August 18, 2003, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 19, 2003.

---

*See footnote, *ante*, page 150.