Filed 4/20/15  P. v. Sanchez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>FREDDY SANCHEZ,<br><br>        Defendant and Respondent. | A140979<br><br>(San Francisco City & County<br>Super. Ct. No. SCN221060) |

The People appeal from the trial court's grant of defendant's motion to set aside the information (Pen. Code, § 995)[1] and subsequent dismissal of the case charging defendant with unlawful possession and carrying of a firearm (§§ 25400, 25850, 29805). On appeal, the People contend a 911 call from an individual in a public park reporting a person carrying either a real or replica firearm in the waistband of his pants, and a second 911 call from another individual at the park reporting a person carrying a gun provided ample grounds to detain and investigate.  We agree and reverse the dismissal order.

## BACKGROUND

We set forth only those facts pertinent to the appeal.  At about 12:00 p.m. on January 1, 2013, Vanessa Zielke, who was walking in Aquatic Park, saw a man carrying either a real or replica gun in the waistband of his pants.  She believed it was a gun based on the shape and the black parts visible from outside his clothing.  Zielke did not see the gun handle or bullets.  Nor did she see the man brandish the weapon at anyone.  After putting some distance between herself and the individual, she called 911, reported what

---

[1] All further undesignated statutory references are to the Penal Code.

1

she had seen, and described the person as "Hispanic or Filipino," wearing a white hat and a gray hoody. She provided both her name and telephone number to the 911 operator and then left the scene out of fear. Later that evening, she provided an oral statement to the police. San Francisco Police Sergeant Ron Liberta received the 911 dispatch from the Zielke call, but was unable to respond.

About 30 minutes later, around 12:36 p.m., Mike Summerhill saw a man loading and cocking a gun, and called 911. Sergeant Liberta also received this second 911 dispatch, which described "a Latin male with a white hat and gray . . . hoodie" carrying a gun in Aquatic Park.

Liberta and his partner, Officer John Van Cole,[2] located defendant and another man "exactly where the person that called 911 described the subjects to be," and defendant "matched the description" of the individual with a gun. The two subjects "were the only [ones] in the area. As they approached the men, the officers then drew their guns because they "were at a position of disadvantage." Van Cole identified himself as a police officer, asked the men to raise their hands in the air, and then asked them to raise their shirts to reveal any concealed weapons. When Van Cole observed a gun in defendant's waistband, Liberta broadcast the information and their location over the police radio. Defendant was wearing a white hat with a gray hoodie.

In the meantime, Park Police Officer Stephen Smith also responded to the dispatch of Summerhill's 911 call.[3] He arrived shortly after Liberta and Van Cole and parked behind their vehicle. He drew his gun when he saw the other officers draw theirs. After defendant was told to get on the ground by Van Cole, Smith handcuffed him and removed the suspected weapon, which turned out to be real and loaded, as well.

The San Francisco District Attorney thereafter filed a three-count felony complaint alleging defendant had unlawfully carried a concealed weapon in a public place (§ 25400,

---

[2] The officer's name is spelled "Van Koll" in the transcript of the 911 call.

[3] Officer Smith testified he was responding to a dispatch about a suspect with a gun at the end of the municipal pier, dressed in all black. The man at the end of the pier in black, however, was Summerhill, not the suspect.

2

subd. (a)(2)), carried a loaded firearm not registered to him in a public place (§ 25850, subd. (a)), and carried a firearm despite having a misdemeanor conviction within the last 10 years (§ 29805).

At the preliminary hearing, the magistrate granted defendant's motion to suppress on the ground the officers had not had reasonable suspicion to detain defendant, and subsequently dismissed the case.

The People filed a motion to reinstate the complaint, which the trial court granted, concluding the magistrate had erroneously granted the motion to suppress. Specifically, the court concluded the fact the case involved 911 calls from callers who identified themselves took the case out of the "anonymous tipster" category of cases.

After the filing of an information, defendant filed a motion to set it aside pursuant to section 995. Other than stating it was agreeing with the magistrate, and disagreeing with the trial court that had granted the motion to reinstate, as to the sufficiency of the 911 calls to support the detention, the trial court granted the section 995 motion without discussion and dismissed the case.

## DISCUSSION

"In this appeal from grant of defendant's motion under section 995, this court 'must draw all presumptions in favor of the magistrate's factual determinations, and we must uphold the magistrate's express or implied findings if they are supported by substantial evidence. [Citations.]' [Citation.]" (*People v. Magee* (2011) 194 Cal.App.4th 178, 182–183. However, " '[w]e judge the legality of the search by "measur[ing] the facts, as found by the trier, against the constitutional standard of reasonableness." [Citation.] Thus, in determining whether the search or seizure was reasonable on the facts found by the magistrate, we exercise our independent judgment. [Citation.]' " (*Id.* at p. 183, quoting *People v. McDonald* (2006) 137 Cal.App.4th 521, 529.)

### The 911 Calls Provided Sufficient Indicia of Reliability for an Investigatory Detention

In *People v. Dolly* (2007) 40 Cal.4th 458 (*Dolly*), the California Supreme Court discussed the sufficiency of *anonymous* 911 calls to support an investigative detention.

In the instant case, neither 911 call was anonymous. Zielke provided both her name and telephone number to the 911 operator. Summerhill also identified himself and remained at the park. The Supreme Court's discussion nevertheless provides considerable guidance as to the sufficiency of the 911 calls to support an investigatory detention.

The court initially explained: " 'The guiding principle in determining the propriety of an investigatory detention is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." [Citations.] In making our determination, we examine "the totality of the circumstances" in each case.' ([*People v.*] *Wells*[ (2006)] 38 Cal.4th [1078,] 1083; see also *People v. Souza* (1994) 9 Cal.4th 224, 227, 230 . . . .) 'Reasonable suspicion is a lesser standard than probable cause, and can arise from less reliable information than required for probable cause, including an anonymous tip.' (*Wells, supra*, 38 Cal.4th at p. 1083.)" (*Dolly, supra*, 40 Cal.4th at p. 463.)

"Indeed," stated the court, it had "recently justified a detention based on an anonymous tip in *Wells*. There, an anonymous caller reported a 1980's-model blue van traveling northbound on Highway 99 north of Bakersfield and weaving all over the roadway. Two or three minutes after receiving the dispatch report, a California Highway Patrol officer spotted a blue van traveling northbound on Highway 99, activated his patrol car lights, and stopped the van to investigate whether the driver was impaired. The officer had seen nothing to indicate the motorist was intoxicated but, after conducting an investigation at the scene, arrested the motorist for driving under the influence. (*Wells, supra*, 38 Cal.4th at pp. 1081, 1083.)" (*Dolly, supra*, 40 Cal.4th at p. 464.)

"In upholding the detention" in *Wells*, the court had "observed that 'a citizen's tip may itself create a reasonable suspicion sufficient to justify a temporary vehicle stop or detention, especially if the circumstances are deemed exigent by reason of possible reckless driving or similar threats to public safety' (*Wells, supra*, 38 Cal.4th at p. 1083) . . . ." (*Dolly, supra*, 40 Cal.4th at p. 464.) It thus "distinguished the United States Supreme Court's decision in *Florida v. J.L.* (2000) 529 U.S. 266 . . . (*J.L.*), which invalidated a detention based on an anonymous phoned-in tip that a young African-

4

American man in a plaid shirt standing at a particular bus stop had a concealed weapon. 'The high court held the tip insufficient to justify a brief detention and patdown search, absent some independent corroboration of the reliability of the tip and the tipster's assertion of illegal conduct. [Citation.] As the court stated, "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." ' (*Wells, supra*, 38 Cal.4th at p. 1084.)" (*Dolly*, at p. 464.)

Accordingly, "[a]fter balancing the public interest in safety and the individual's right to personal security free from arbitrary interference by law enforcement officers," the court "determined in *Wells* that the relative urgency presented by drunk or erratic drivers could justify an investigatory detention based on an anonymous tip despite the absence of corroborating evidence of illegal activity. A tip's reliability . . . need not depend exclusively on its ability to predict the suspect's future behavior (see, e.g., *Alabama v. White* (1990) 496 U.S. 325, 332 . . .) or the officer's ability to corroborate present illegal activity (see, e.g., *People v. Butler* (2003) 111 Cal.App.4th 150, 162 . . .). Rather, the tip's reliability depends upon an assessment of 'the totality of the circumstances in a given case.' (*Wells, supra*, 38 Cal.4th at p. 1088 . . . [additional citations omitted].) (*Dolly, supra,* 40 Cal.4th at p. 464.)

In light of all "these (and other factors)," the court in *Dolly* upheld an investigatory detention following an anonymous 911 call that the defendant had just "pulled a gun" and threatened to shoot the caller, who provided a description of the defendant and the car he was driving, and location of the incident. The caller also stated he did not want to remain at the scene or to provide his identity. (*Dolly, supra,* 40 Cal.4th at pp. 462, 465–466.)

"First," stated the court, the "defendant's conduct in pointing a revolver at the caller in an apparent threat to shoot him posed a grave and immediate risk not only to the caller but also to anyone nearby. (*U.S. v. Holloway* (11th Cir. 2002) 290 F.3d 1331, 1339 (*Holloway*) [anonymous 911 call reporting gunshots and arguing 'involved a serious threat to human life'].) '[A]llegations of the threatening use of a weapon, made by

5

person claiming to be an eyewitness to the threats, required immediate police action' and 'is materially distinguishable from the anonymous tip at issue in *Florida v. J.L.*,' which involved only an allegation of a concealed weapon. (*Ray v. Village of Woodridge* (N.D.Ill.2002) 221 F.Supp.2d 906, 914 . . . .)" (*Dolly, supra,* 40 Cal.4th at p. 465.)

"Second, there is no reason to think that anonymous phoned-in tips concerning contemporaneous threats with a firearm are any more likely to be hoaxes than are anonymous phoned-in tips concerning a contemporaneous event of reckless driving. (Compare [*United States v.*] *Terry–Crespo*[ (9th Cir. 2004)] 356 F.3d [1170,] 1177 with *Wells, supra*, 38 Cal.4th at p. 1087 . . . .) Indeed, the call here bore stronger indicia of reliability than did the call in *Wells*. Unlike *Wells*, where the record was 'silent' as to the circumstances leading to the call or the call itself (*id.* at p. 1081), this case involves a 911 call that was taped. '911 calls are the predominant means of communicating emergency situations' and 'are distinctive in that they concern contemporaneous emergency events, not general criminal behavior. . . . If law enforcement could not rely on information conveyed by anonymous 911 callers, their ability to respond effectively to emergency situations would be significantly curtailed.' (*Holloway, supra*, 290 F.3d at p. 1339; see *Terry–Crespo, supra,* 356 F.3d at p. 1176 [911 calls are "entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch"] . . . .)" (*Dolly, supra,* 40 Cal.4th at p. 467.)

"Third, the tipster-victim provided a firsthand, contemporaneous description of the crime as well as an accurate and complete description of the perpetrator and his location, the details of which were confirmed within minutes by the police when they arrived." (*Dolly, supra*, 40 Cal.4th at p. 468.)

The United States Supreme Court has also recently emphasized the significance of 911 calls, even if anonymous. In *Navarette v. California* (2014) __ U.S. __ [134 S.Ct. 1683] (*Navarette*), an anonymous 911 caller reported being run off the road by another driver and described the vehicle and license plate. (*Id.* at pp. 1686–1687.) The CHP located the driver and discovered 30 pounds of marijuana. (*Id.* at p. 1687.) The defendant unsuccessfully attempted to suppress the evidence for lack of reasonable

6

suspicion.  (*Ibid.*)  The United States Supreme Court concluded the reported information was sufficiently reliable for an investigative detention.  (*Ibid.*)

The caller identified the make, color and model of the vehicle and the license plate—information, corroborating the caller was an eyewitness and suggesting trustworthiness.  (*Navarette, supra*, __ U.S. __ at p. __ [134 S.Ct. at p. 1689].)  The timing of the call also indicated the caller was reporting a contemporaneous observation—an additional indicator of reliability.  In contrast, there had been "no indication that the tip in *J. L.* . . . was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event, but those considerations weigh in favor of the caller's veracity here."  (*Ibid.*)  Finally, the caller used the 911 emergency system, which "has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity."  (*Ibid.*)  "The caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call."  (*Id.* at p. 1690)

With this overview, we turn to the 911 calls at issue here.  We note neither the magistrate granting the initial motion to suppress, nor the trial court granting the section 995 motion to dismiss, had the benefit of the United State's Supreme Court's recent decision in *Navarette*.

### 911 Call by Ms. Zielke

To begin with, as we observed above, Ms. Zielke's 911 call was not an anonymous call.  She not only provided her name, but she also provided contact information so law enforcement could contact her later, which they did.  This is reason enough to conclude her 911 call was sufficiently reliable to support the detention.  In addition, it was apparent she was reporting a contemporaneous sighting.  Moreover, this event was occurring at a public park, where there was a heightened degree of risk to the general public.  Zielke also provided an adequate description for officers to locate the person about whom she was concerned.

7

The fact Zielke did not remain on the scene does not detract from all the other indicia of reliability of her 911 call. Indeed, it is not surprising she chose not to remain in the vicinity of someone who might be armed with a concealed weapon. That Zielke also could not tell whether defendant was carrying a real or replica weapon is also beside the point. The purpose of a detention is to *investigate* a reasonable suspicion of possible criminal activity. If it turns out there is no basis for concern, the brief investigatory detention has served its purpose and ends. On the other hand, if the investigation confirms there is probable cause to make an arrest, the detention has served its additional purpose of protecting the public's safety.

In short, even if Zielke's 911 call had been the only call that was made, it would have provided sufficient basis for the officers to make an investigatory detention to determine whether defendant was in fact carrying a concealed weapon.

### *911 Call by Mr. Summerhill*

Mr. Summerhill's 911 call also was not an anonymous call, and all the indicia of reliability attendant to Ms. Zielke's 911 call, also pertain to his 911 call. In addition, Summerhill remained within sight distance. Thus, Summerhill's call, alone, also provided a basis for an investigatory detention.

Defendant contends Summerhill's description of defendant and the locale was different than Zielke's, and thus the second 911 call undercut reasonable suspicion. Defendant, however, overstates the differences in the calls and disregards the similarities. Zielke's 911 call around 12:00 p.m. described a Hispanic or Filipino man, wearing a white hat and gray hoodie, carrying what looked like a gun in Aquatic Park Summerhill made his call about 30 minutes later, describing two Latin male adults in Aquatic Park, one of whom had a gun and wore a hat and gray sweatshirt. Given the similar description, race, and purported criminal activity, the second 911 call does not undercut, and in fact, corroborates the first call.[4]

_____

[4] Defendant has filed an application to file a letter brief in which he asserts the People " 'waived any reliance on Exhibit One as a basis for arguing that the officers had reasonable suspicion,' " by citing that evidence only in their reply brief and not their

Defendant does not dispute it is illegal to carry a loaded gun in public (§ 25850). Therefore, he essentially concedes the officers had a reasonable suspicion criminal activity was afoot, justifying the detention to investigate further.

*The Patdown Search*

Although it is not entirely clear, it appears defendant also contends that even if the detention based on the 911 calls was valid, as we have concluded it was, the subsequent patdown search was unjustified under *Arizona v. Johnson* (2009) 555 U.S. 323, 326 (*Arizona*). In *Arizona*, the United States Supreme Court, citing *Terry v. Ohio* (1968) 392 U.S. 1, noted a "stop and frisk" is constitutionally permissible if (1) the investigatory stop is lawful and (2) the police officer reasonably suspects the person stopped is armed and dangerous. (*Arizona*, at pp. 326–327.) Both requirements are satisfied here. As we have discussed, the officers had ample basis for an investigative stop. And since the purpose of the detention was to determine whether defendant was in possession of a firearm in a public park, the officers also had ample basis to conduct a patdown search.

## DISPOSITION

The order granting defendant's section 995 motion is reversed, and the information is reinstated for further criminal proceedings.

---

opening brief. We grant the request, but conclude his argument in the letter brief has no merit. He relies on the general rule "arguments made for the first time in a reply brief will not be entertained," citing *People v. Tully* (2012) 54 Cal.4th 952, 1075 and *People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1232. The People, however, did not raise a different argument in their reply brief: they simply bolstered their argument that the officers had reasonable suspicion by citing more evidence in the record, which the trial court admitted for the nonhearsay purpose of showing "what information was provided to the police at that time."

                             _____

                             Banke, J.

We concur:


_____

Humes, P. J.


_____

Margulies, J.