Filed 5/15/15  P. v. Bravo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VIDAL BRAVO,<br><br>    Defendant and Appellant. | F067658<br><br>(Super. Ct. No. BF144072A)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Cornell, Acting P.J., Poochigian, J. and Smith, J.

## INTRODUCTION

Appellant Vidal Bravo entered into a plea agreement pursuant to which he pled no contest to unlawful possession of a firearm, resisting an officer, and violating Penal Code section 186.22, subdivision (a).[1] He also admitted a prior conviction. He contends the judgment should be reversed because the trial court erred in denying his motion to suppress. Bravo also asks this court to review independently the materials produced in response to his motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 and determine if the trial court erred in not releasing any documents.

We conclude the trial court did not err in denying the motion to suppress or in its ruling on the *Pitchess* motion. We will affirm the judgment.

## FACTUAL AND PROCEDURAL SUMMARY

Because Bravo pled to the charges, the facts are derived from the preliminary hearing and motion to suppress transcripts. A criminal street gang in Bakersfield is the Okie Bakers. The gang associates with the color blue and uses the letters "O," "OBKS," "OBM," and "OBC." The Okie Bakers are rivals of the Norteño gangs. The Padre Street area is known for a lot of narcotic and gang activities. The primary activities of the Okie Bakers gang include murder, burglary, robbery, possession of illegal weapons, and possession of narcotics for sale.

Bakersfield Police Officer Isaac Aleman was assigned to the police department's gang unit in 2010. On September 17, 2012, at approximately 6:17 p.m., Aleman was on duty in a patrol car with his partner Officer Larry Esparza. Aleman encountered Bravo and Erik Arrieta on Padre Street. The location was within the boundaries of the area claimed by the Okie Bakers gang.

Bravo was shirtless and had numerous tattoos on his upper body; all the tattoos were associated with the Okie Bakers gang. Bravo and Arrieta were standing near the

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

2.

street, in the driveway of an apartment complex, drinking beer and in the company of three other individuals. One of the men in the group was wearing a baseball cap with "O's" in black lettering.

The patrol vehicle was approximately 20 feet from Bravo and Arrieta when the officers noticed them standing in the driveway facing the street. Without using any emergency lights or siren, Aleman parked the patrol vehicle directly in front of the driveway in order to make contact with the men. Aleman stepped out of his patrol vehicle and asked to speak to Bravo and Arrieta, but the two men turned away.

As the two men turned and faced away from the officers, they came "close together" and Arrieta put his left arm around Bravo's neck and shoulder and pulled Bravo closer to him. As they did this, Arrieta reached into his pocket with his right hand, removed an item, and appeared to hand the item to Bravo. Bravo appeared to place the object in his left pocket. They did this as they were walking away from the officers. Aleman was approximately 10 feet away from the two men when he saw the exchange.

Although Aleman did not see anything actually pass between Bravo and Arrieta, based upon his training and experience, the gestures appeared to be a hand-to-hand transaction of either narcotics or a weapon. Aleman and Esparza continued to walk toward Bravo and Arrieta, repeatedly asking the two men to stop. Bravo and Arrieta did not stop but instead walked to an open apartment door.

The officers ran toward Bravo and Arrieta to stop them from entering the apartment but did not draw any weapons. Aleman stopped Arrieta, who indicated he was on probation; Esparza stopped Bravo. For officer safety concerns, and because Arrieta was on probation, Aleman conducted a search of Arrieta. Esparza used his left hand to hold Bravo's hands behind his head, while at the same time using his right hand to conduct a patdown search. While conducting the search, Esparza felt a small gun in the front left shorts pocket of Bravo's pants and yelled, "Gun." Esparza reached into the

3.

pocket and pulled out a .25-caliber firearm; Bravo stated, "It's a lighter." This was the same pocket that Bravo reached into after the hand-to-hand gesture from Arrieta.

Esparza placed Bravo in handcuffs as additional officers arrived on the scene to assist. Esparza handed the firearm to Officer Clifton Ary. Ary checked the weapon and found it was operable and loaded. Esparza placed Bravo in the patrol vehicle, where he became combative. Ary was stationed at the vehicle with Bravo. During the encounter, Bravo had given the officers a false name and birth date.

Ary asked Bravo his true name, to which Bravo responded, "Fuck you, bitch." Bravo at this point was seated in the backseat of the patrol vehicle, the door was open, and Bravo was facing outward with his feet outside the patrol vehicle. Ary again asked Bravo his name; Bravo responded by spitting in Ary's face. Bravo then leaned back and tried to kick Ary. Another officer came to assist Ary as Bravo continued to try to spit on both officers. Eventually, a spit mask was placed on Bravo. Bravo was then placed completely inside the patrol vehicle and all doors were closed. Bravo began hitting his head against the metal barrier between the front and backseats and kicking the barrier and seatbacks. A hobble was placed around Bravo's ankles to prevent this activity.

Bravo was read his rights pursuant to *Miranda*[2] and thereafter indicated he did not have any knowledge of the gun found in his pocket. When reminded he had claimed the gun was a lighter, Bravo ceased talking.

Esparza ran a records check and found all the men were either on probation or parole or had outstanding warrants for their arrest. Bravo's true identity was determined and it was found he was on parole for manslaughter.

On October 9, 2012, Bravo was charged with being a felon in possession of a firearm (count 1), carrying a loaded firearm in a public place as a gang member (count 2), and resisting arrest by means of threats or violence (count 3), all felonies. It was alleged

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

4.

as to counts 1 and 3 that the offenses were committed for the benefit of a criminal street gang. As to all counts, prior strike, prior serious felony, and prior prison term enhancements were alleged.

On November 14, 2012, Bravo filed a motion to suppress and a *Pitchess* motion. The People filed oppositions to both motions.

On December 19, 2012, the trial court held an in camera hearing on the *Pitchess* motion. One document was ordered disclosed. The hearing on the motion to suppress was held on February 6, 2013. The trial court denied the motion.

On April 22, 2013, the trial court granted the People's request to amend the information to allege a violation of section 186.22, subdivision (a), the gang offense, as a misdemeanor. Pursuant to a plea agreement, Bravo pled no contest to counts 1 and 3, as well as the gang offense, and admitted the strike prior. The remaining count and enhancements were dismissed as part of the plea agreement.

On May 21, 2013, pursuant to the terms of the plea agreement, Bravo was sentenced to a total term of seven years four months.

## DISCUSSION

Bravo contends the judgment must be reversed because the trial court erred in denying his motion to suppress. He also asks this court to determine if the trial court erred in its ruling on the *Pitchess* motion.

## I.  *Pitchess* **Motion**

On November 14, 2012, prior to trial, Bravo filed a *Pitchess* motion. In defense counsel's supporting affidavit, counsel averred that Ary and Aleman "fabricated their observations regarding the use of force" and "the necessity for the use of force" against Bravo. Counsel averred that Bravo "did not provoke the use of force and did not resist or become combative." The trial court agreed to conduct a *Pitchess* hearing as to Aleman and Ary for "dishonesty." The trial court ordered that discoverable materials, if any, were to be provided to the defense within 10 days. Out of all the files reviewed, one file

5.

pertaining to Aleman was released—a complaint filed October 24, 2012, alleging Aleman had falsified a police report.

On appeal, this court examines the materials reviewed by the trial court to determine whether the trial court abused its discretion in denying release. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1232 (*Mooc*).) To the extent Bravo's *Pitchess* motion was intertwined with his motion to suppress, it is an issue that is cognizable on appeal. (*People v. Collins* (2004) 115 Cal.App.4th 137, 141.)

Although the *Pitchess* motion focused on events after the arrest, and in that regard did not implicate the motion to suppress, the trial court granted the motion as to dishonesty, which arguably could have impacted the motion to suppress. We have reviewed all of the materials produced in response to the *Pitchess* motion and conclude the trial court did not abuse its discretion. (*Mooc*, *supra*, 26 Cal.4th at p. 1229.)

## II.     Motion to Suppress

Bravo contends the officers illegally detained and searched him; consequently, the trial court erred in denying his motion to suppress. We disagree.

Evidence seized in violation of the Fourth Amendment is to be excluded. (*People v. Maikhio* (2011) 51 Cal.4th 1074, 1089.) In reviewing a ruling on a motion to suppress, we review the resolution of the factual inquiry under the deferential substantial evidence standard. The application of the facts to the law is subject to independent review. (*People v. Harris* (2015) 234 Cal.App.4th 671, 681.)

Bravo moved to suppress the evidence of the gun found in his pocket and the "observations prior to." Both in this appeal and in the trial court, there does not appear to be any dispute as to the observations of the officers and that a gun was found in Bravo's pocket. The issue is whether these facts warranted a detention and search.

### *Detention*

We first address the issue of whether Bravo was detained lawfully. A detention is reasonable when officers can point to specific articulable facts under the totality of the

circumstances, providing some objective manifestation the person may be involved in criminal activity. (*People v. Souza* (1994) 9 Cal.4th 224, 231 (*Souza*).) We note that no detention occurred until the time Aleman and Esparza prevented Bravo from entering the apartment; Bravo did not submit to the officers' authority until that point in time. (*California v. Hodari D.* (1991) 499 U.S. 621, 626.)

All of the observations made by the officers prior to the detention did not implicate the Fourth Amendment because observing what is exposed to public view is not a search; there is no expectation of privacy while in public. Fourth Amendment protection is not extended to public areas and areas open to public view, such as driveways. (*People v. Lieng* (2010) 190 Cal.App.4th 1213, 1224-1225.)

Here, the officers were at a location known to be within territory claimed by the Okie Bakers gang and they observed Bravo. The officers knew the area was known for drug and gang activities. They saw Bravo drinking beer and observed that he had numerous Okie Bakers gang tattoos. When officers stopped and asked to talk to Bravo and the other men, Bravo turned away and engaged in a hand-to-hand exchange with Arrieta.

Police officers view facts through the lenses of their experience and expertise. (*People v. Butler* (2003) 111 Cal.App.4th 150, 159.) The officers knew the area was known for criminal activity; the area's reputation for criminal activity was a factor that could lend meaning to a person's behavior and contribute to a justification for a detention. (*Souza*, *supra*, 9 Cal.4th at p. 240.) The evasive conduct of turning away when officers ask to speak with a person, as Bravo did here, also can be a factor that affects a decision to detain a person. (*Id.* at p. 241.) Based upon Aleman's training and experience, he thought the hand-to-hand exchange was a transfer of narcotics or a weapon.

The facts here are very similar to those of *People v. Limon* (1993) 17 Cal.App.4th 524, where the officer knew the location was a known site for drug activity and the

defendant made a hand-to-hand exchange and stashed an item in his pocket.  Under those circumstances, a detention was warranted.  (*Id.* at pp. 532, 534-537.)  Similarly, under the totality of the circumstances here, Bravo's detention was warranted.  (*Souza*, *supra*, 9 Cal.4th at p. 231.)

### *Search*

Having concluded the detention of Bravo was warranted and thus lawful, we address the issue of whether the search was lawful.  We conclude it was.

A patdown search of an individual an officer is detaining lawfully is warranted if there is cause to believe the person may be armed and dangerous to the officer or others. (*People v. Rios* (2011) 193 Cal.App.4th 584, 599.)  An officer need not be certain that a detained person is armed; the fundamental test is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  (*People v. Castaneda* (1995) 35 Cal.App.4th 1222, 1230 (*Castaneda*).)

In the present case, the officers were in Okie Bakers gang territory, a gang known for possession of illegal weapons and narcotics.  Based upon Bravo's tattoos and the attire of the other men, the officers were dealing with one or more Okie Bakers gang members; Bravo had just engaged in a hand-to-hand exchange with another gang member; and, based upon the officers' training and experience, they thought the exchange was a transfer of a weapon or possibly narcotics.  These facts combined warranted a patdown of Bravo.  (*Castaneda, supra,* 35 Cal.App.4th at p. 1230.)  While conducting the patdown of Bravo, Esparza felt an object in Bravo's pocket that felt like a gun.  When he reached in and pulled out the object, it was a .25-caliber firearm.

Under the circumstances, the search of Bravo while he was detained was lawful. (*People v. Dickey* (1994) 21 Cal.App.4th 952, 957.)

## DISPOSITION

The judgment is affirmed.